**The PEOPLE of the State of Colorado, Plaintiff–Appellee and Cross–Appellant,**

**v.**

**Nathan Jerard DUNLAP, Defendant–Appellant and Cross–Appellee.**

**No. 96SA245.**

Supreme Court of Colorado, En Banc.

March 8, 1999.

Rehearing Denied April 12, 1999.*

* JUSTICE SCOTT does not participate.

726

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, John Daniel Dailey, Deputy Attorney General, Paul R. Wolff, Assistant Attorney General, Paul Koehler, Assistant Attorney General, Criminal Enforcement Section, Capital Crimes Unit, Denver, Colorado, Jim Peters, Arapahoe County District Attorney, Littleton, Colorado, Attorneys for Plaintiff–Appellee and Cross–Appellant.

Barbara S. Blackman, Indianapolis, Indiana, Roman, Benezra & Culver, LLC, Seth J. Benezra, Lakewood, Colorado, Attorneys for Defendant–Appellant and Cross–Appellee.

JUSTICE KOURLIS delivered the Opinion of the Court.

Table of Contents *

I. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733
II. The Constitutional and Statutory Sentencing Requirements . . . . . . . . . . . . . . . . . . . . 735
III. The Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 736
IV. Prosecution Evidence Introduced to Rebut Mitigating Factors . . . . . . . . . . . . . . . . 737
 A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 737

B. Constitutional Law ................................................. 739
C. Admissibility of Aggravating Evidence in *Tenneson* Step Four .............. 740
D. Admissibility of Relevant Evidence .................................... 741
E. Error Analysis ..................................................... 742
V. Inflammatory Evidence .............................................. 743
A. Tattoo Evidence .................................................. 743
B. Victim Impact Evidence ............................................ 744
C. Photographic Evidence ............................................. 746
VI. Statutory Aggravators ............................................... 747
A. Doubling of Aggravators ............................................ 747
B. Alleged Vagueness of Aggravators .................................... 749
1. Grave Risk of Death ............................................ 749
2. Lying in Wait ................................................. 751
C. Insufficient Evidence that Dunlap Killed to Prevent Arrest ................. 752
D. Conviction for Burger King Robbery as Basis for Aggravator ............... 753
VII. Polygraph Evidence ................................................. 755
A. Factual Background ................................................ 755
B. Constitutionality of the Per Se Rule ................................. 755
VIII. Prosecutorial Misconduct ............................................ 757
A. Guilt Phase ...................................................... 757
B. Penalty Phase .................................................... 759
IX. Independent Review ................................................. 764

\* This Table of Contents and the section headings throughout this opinion are offered solely for the convenience of the reader and do not control or modify the substance of each section.

In May 1996, following four death verdicts from a unanimous jury, a trial court of this state sentenced Nathan Gerard Dunlap to death for his murder of three teenagers and a fifty-year-old woman at a restaurant in Aurora, Colorado. Dunlap now seeks review of his death sentence by direct appeal to this court,[1] arguing that errors in the penalty phase of his trial[2] require this court to set aside his death penalty and resentence him to life imprisonment. Dunlap does not challenge the validity of his convictions, so the only issue on appeal is whether errors in the guilt or penalty phase of Dunlap's trial warrant the reversal of his death sentence. We conclude that they do not, and we therefore affirm the sentence of death.

## I. Factual Background

In May 1993, nineteen-year-old Nathan Dunlap began working as a cook at the Chuck E Cheese's restaurant in Aurora. In late July, Dunlap and his supervisor had a disagreement over whether Dunlap would work additional hours beyond his scheduled shift, and Dunlap's supervisor fired him.

The evidence at trial suggested that Dunlap was angry about being fired and felt that his supervisor had made a fool of him.

Later that summer, Dunlap told a former Chuck E Cheese's co-worker that he planned to "get even" for the incident. He talked with other friends about robbing Chuck E Cheese's and killing his former supervisor. Then, on December 14, 1993, while playing basketball with friends, Dunlap indicated that his mind was made up and that he was going to "go to Chuck E Cheese, kill them all, and take the money."

That night, shortly before 9:00 p.m., Dunlap went to the restaurant, carrying a concealed small caliber handgun. He ordered a sandwich, and sat alone at a table near the front of the restaurant. Later, he played a video game, talked to a Chuck E Cheese's employee who had just finished a shift, and called his girlfriend. He learned that his former supervisor was not working that night. Then, at some point after about 9:50 p.m., he went into the men's bathroom and waited until the restaurant closed at 10:00 p.m.

1. We have jurisdiction to hear this appeal pursuant to section 16–11–103(6), 8A C.R.S. (1993 Supp.).

2. Dunlap also makes some arguments regarding the prosecutor's conduct during the guilt phase of the trial, but his principal contentions revolve around the penalty phase of the trial.

While Dunlap was in the bathroom, the last customers left, and five Chuck E Cheese's employees began to close for the night. Nineteen-year-old Sylvia Crowell began disassembling a salad bar close to the bathroom where Dunlap hid. Seventeen-year-old Ben Grant ran a vacuum cleaner near Crowell, and seventeen-year-old Colleen O'Connor performed closing duties further back in the dining area. Bobby Stephens, who was nineteen years old, was cleaning the kitchen, and Marge Kohlberg, the restaurant's assistant manager, totaled the day's receipts in a back office.

At some point shortly after 10:05 p.m., Dunlap emerged from the bathroom, walked up behind Sylvia Crowell and shot her from close range behind the right ear. Next, Dunlap approached Ben Grant, and shot him in the face near his left eye.

Dunlap then turned to Colleen O'Connor, who knelt before him, begging for her life and promising not to tell anyone what she had seen. Dunlap shot her through the top of her head. A witness later testified that Dunlap said that "she went out like a soldier."

Then Dunlap burst into the kitchen and shot Stephens in the face. The bullet knocked Stephens to the floor, but did not kill him.

Dunlap left the kitchen, and entered the office where Marge Kohlberg was working. He commanded her to open the restaurant's safe, which she did, and then he shot her through an ear. Kohlberg fell to the floor. Believing Kohlberg was still alive, Dunlap shot her through the other ear, killing her instantly. He took Kolhberg's purse and emptied it over her body. He then loaded the purse with approximately $1500 from the safe, Chuck E Cheese's key chains, and arcade game tokens, and left.

Meanwhile, Bobby Stephens recovered from his initial shock, and left the restaurant through an emergency door, setting off an alarm. He ran to a nearby condominium complex for assistance. Shortly thereafter, paramedics arrived at the restaurant, but within a few hours every victim but Stephens had died.

Upon leaving Chuck E Cheese's, Dunlap went to the nearby apartment of two of his friends, arriving shortly after 10:00 p.m. He described his crimes to his friend Carl Wilson, with whom he counted the stolen money, and asked Wilson to give him an alibi. According to Wilson, Dunlap said, "I did it. Chuck E Cheese."

Dunlap then went to the home of his girlfriend, Tracie Lechman, where he had a telephone conversation with his mother, Carol Dunlap. His mother told him that she was with police officers, who were already looking for him, and he agreed to meet with the officers. Later, Lechman overheard Dunlap asking someone over the telephone if peroxide would remove gunshot residue. Following this conversation, Dunlap washed his hands with peroxide and took a shower.

Dunlap subsequently met with the police and asserted that he had left Chuck E Cheese's between 9:00 p.m. and 9:20 p.m. The following morning, the police arrested Dunlap. On December 23, 1993, the People charged Dunlap with four counts of deliberative murder in violation of section 18–3–102(1)(a), 6 C.R.S. (1998), four counts of felony murder in violation of section 18–3–102(1)(b), 6 C.R.S. (1998), attempted first degree murder after deliberation in violation of sections 18–2–101, 8B C.R.S. (1993 Supp.), and 18–3–102(1)(a), 6 C.R.S. (1998), attempted first degree felony murder in violation of sections 18–2–101 and 18–3–102(1)(b), 6 C.R.S. (1998), first degree burglary in violation of section 18–4–202, 6 C.R.S. (1998), first degree assault in violation of section 18–3–202(1)(a), 6 C.R.S. (1998), aggravated robbery in violation of section 18–4–302(1)(a)(b), 8B C.R.S. (1986), theft in violation of section 18–4–401, 8B C.R.S. (1993 Supp.), and three violent crime sentencing counts pursuant to section 16–11–309, 8A C.R.S. (1993 Supp.). On January 20, 1995, the People announced that they would seek the death penalty.

Following extensive pre-trial motion hearings throughout most of 1995, Dunlap's capital murder jury trial began on January 12, 1996. The trial concluded six weeks later, on February 26, 1996, when the jury found Dunlap guilty of all charges filed. The trial proceeded into the penalty phase on Febru-

ary 28, 1996. On March 7, 1996, the jury returned four verdicts of death. On May 17, 1996, the trial court sentenced Dunlap to death on the four murder counts, and to the Department of Corrections for consecutive terms totaling 113 years for the other counts. Dunlap appealed to this court, alleging various errors in the sentencing phase of the trial.

## II. The Constitutional and Statutory Sentencing Requirements

■ This court has previously upheld the constitutionality of the death penalty in Colorado under a prior version of the statute at issue. *See People v. Davis*, 794 P.2d 159, 170–72 (Colo.1990). Indeed, it is now well-settled that the death penalty is not inherently cruel and unusual under the Eighth Amendment. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ What the Eighth Amendment does require is that the death penalty be "imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Accordingly, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared," that discretion must "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant v. Stephens*, 462 U.S. 862, 874, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (quoting *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909).

■ For purposes of addressing Eighth Amendment concerns in capital proceedings, the United States Supreme Court divides the decision-making process into two stages: the eligibility decision and the selection decision. *See Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). The eligibility stage serves to narrow "the categories of murders for which a death sentence may ever be imposed." *Jurek v. Texas*, 428 U.S. 262, 270, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Hence,

> there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decision-maker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. Moreover, a societal consensus that the death penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense.

*McCleskey v. Kemp*, 481 U.S. 279, 305–06, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

■ In general, states have employed two methods—"weighing" and "non-weighing"—to achieve the function of narrowing the class of defendants eligible for imposition of the death penalty. Both methods begin with a constitutionally mandated first step: in order for a defendant to be eligible for the death penalty, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. 2630. Thus, the finding of at least one aggravating circumstance, or "aggravating factor" under our statutory terminology, is an essential constitutional component of death penalty statutes in both weighing and non-weighing states.

■ In a weighing state, once the jury has found the existence of at least one aggravating factor, it must then weigh the aggravating factor or factors against all mitigating evidence. *See, e.g., Stringer v. Black*, 503 U.S. 222, 229, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (describing Mississippi's weighing statute). By contrast, in a non-weighing state, "aggravating factors as such have no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it." *Id.* at 229–30, 112 S.Ct. 1130 (describing Georgia's non-weighing statute). Instead, in "'making the decision as to the penalty, the factfinder takes into consideration all circumstances before it from both the guilt-innocence and the sentence phases of the trial.'" *Id.* at 230, 112 S.Ct. 1130 (quoting *Zant*, 462 U.S. at 872, 103 S.Ct. 2733).

■ Next, once a jury has found a defendant eligible for the death penalty, the jury must move to the selection stage. In the selection stage, the "sentencer deter-

mines whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. 2630. The objective at this stage is to make "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Id.* (quoting *Zant*, 462 U.S. at 879, 103 S.Ct. 2733); *see also McCleskey v. Kemp*, 481 U.S. 279, 302, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (requiring "a particularized inquiry into the circumstances of the offense together with the character and propensities of the offender") (internal quotation marks omitted). The selection determination requires the admission of all relevant evidence in order to allow the jury to measure the culpability of the individual defendant. *See Lockett v. Ohio*, 438 U.S. 586, 598, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gregg*, 428 U.S. at 204, 96 S.Ct. 2909 ("We think it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); *Jurek*, 428 U.S. at 271, 96 S.Ct. 2950 ("What is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine.") (emphasis added).

▮ Colorado's capital sentencing scheme consists of four steps. *See People v. Tenneson*, 788 P.2d 786, 791–92 (Colo.1990). First, it narrows the group of individuals convicted of first degree murder at the eligibility stage by requiring that the jury be satisfied beyond a reasonable doubt of the existence of at least one of the statutorily specified aggravators.[3] At the next stage, the statute contemplates that the jury will consider evidence to "decide whether any mitigating factors exist." *Id.* at 791. Third, based upon that evidence, the jury must decide beyond a reasonable doubt whether "mitigating factors exist which outweigh any aggravating factor or factors found to exist." *Id.; see also* § 16–11–103(2)(a)(II). If the jury finds that the mitigating factors do not outweigh the statutorily specified aggravators, then the jury moves to the fourth and final stage of determining whether the defendant should be sentenced to death or to life imprisonment.[4]

Hence, up to step three, Colorado's death penalty process resembles that of a weighing state. However, Colorado's fourth step, in which the jury considers all relevant evidence without necessarily giving special consideration to statutory aggravators or mitigators, resembles the selection stage of a non-weighing state.

That is the statutory and constitutional framework within which we address Dunlap's contentions that the sentencing proceeding in his case violated constitutional mandates.

### III. The Standard of Review

▮ There are two categories of constitutional error that may occur during the course of a criminal proceeding: trial error and structural error. *See Bogdanov v. People*, 941 P.2d 247, 252 (Colo.1997). Trial errors

---

3. *See id.* at 791. Statutory aggravators are listed specifically. *See* § 16–11–103(5). Mitigating factors, however, are not limited by statute. Rather, the last paragraph of section 16–11–103(4), which addresses mitigating factors, includes "[a]ny other evidence which in the court's opinion bears on the question of mitigation." § 16–11–103(4)(*l*); *see also Tenneson*, 788 P.2d at 791 n. 6.

4. *See Tenneson*, 788 P.2d at 792; *see also* § 16–11–103(2)(a)(III). The statutory foundation for *Tenneson* step four was section 16–11–103(2)(a)(III), 8A C.R.S. (1986), which required the jury to determine, "[b]ased on the considerations [in the earlier *Tenneson* steps], whether the defendant should be sentenced to death or life imprisonment." § 16–11–103(2)(a)(III). Because the General Assembly deleted subsection (2)(a)(III) from section 16–11–103 in 1988, the court in *Tenneson* observed that the 1988 statute

"collapsed the sentencing process into three steps, eliminating step four." *Tenneson*, 788 P.2d at 789 n. 3; *see also* § 16–11–103(2), 8A C.R.S. (1988). Three years later, in *People v. Young*, this court held that the three-step process under the amended statute was unconstitutional absent the sentencing discretion afforded to the jury by the former step four. *See People v. Young*, 814 P.2d 834, 844–45 (Colo.1991). Subsequently, in late 1991, the General Assembly repealed and reenacted the sentencing statute, including within the new statute the subsection (2)(a)(III) language that the General Assembly had removed in 1988. *See* § 16–11–103(2)(a)(III), 8A C.R.S. (1992). Since then, *Tenneson* step four has functioned as an established element within the structure of our statute. *See, e.g., People v. White*, 870 P.2d 424, 438 (Colo.1994); *People v. Aguayo*, 840 P.2d 336, 343 (Colo.1992).

occur during the course of the presentation of the case to the jury and appellate courts evaluate them in light of the other evidence presented. Structural errors affect the framework of the trial itself. Appellate courts do not review such errors in the context of the evidence in the record, because the nature of the error is "necessarily unquantifiable and indeterminate." *Id.* at 253. Rather, structural errors render the trial process fundamentally unfair. *See id.*

■ In contrast, trial errors are compatible with both harmless error and plain error analysis. If the defendant lodges no objection to the evidence or procedure, then this court will consider the error only under the plain error standard even in a death penalty case. *See Davis,* 794 P.2d at 189.

■ If the defendant does object, then we consider the constitutional error under a harmless error analysis. Under this standard, trial errors require reversal "unless the appellate court can 'declare a belief that [the error] was harmless beyond a reasonable doubt.'" *Key v. People,* 865 P.2d 822, 827 (Colo.1994) (quoting *Leonardo v. People,* 728 P.2d 1252, 1257 (Colo.1986)); *see also Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Blecha v. People,* 962 P.2d 931, 942 (Colo.1998). The crucial question, as the United States Supreme Court explained over fifty years ago, is:

> what effect the error had or reasonably may be taken to have had upon the jury's decision. This must take account of what the error meant to them, not singled out and standing alone, but *in relation to all else that happened.*

*Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (emphasis added).

### IV. Prosecution Evidence Introduced to Rebut Mitigating Factors

With that understanding of what our statute and the Constitution require, and of the court's proper standard of review, we turn to Dunlap's specific assertions of error. Dunlap first contends that the sentencing phase vio-

lated his rights under the Eighth and Fourteenth Amendments, as well as corresponding sections in the Colorado Constitution,[5] because the People introduced evidence in rebuttal of mitigating factors that Dunlap had not raised.

The General Assembly chose to identify various factors that the jury could consider to mitigate against imposition of the death penalty. *See* § 16–11–103(4). The listed factors are not all-inclusive because the final factor is "any other evidence which in the court's opinion bears on the question of mitigation." § 16–11–103(4)(*l*). Here, the court gave the jury a jury instruction that itemized the mitigators included in the statute, whether the defendant had raised each mitigator or not.

■ The prosecution introduced evidence directed toward rebutting the existence of certain mitigators upon which Dunlap did not rely. Dunlap argues that the trial court's decision to allow the prosecution to rebut such mitigating factors effectively enabled the prosecution to create additional aggravating factors not identified in the statute. These "non-statutory aggravators," Dunlap contends, unconstitutionally swayed the jury's weighing of aggravating and mitigating factors under section 16–11–103(2)(b)(II).

Although we conclude that the evidence offered by the prosecution was properly admissible for purposes of guiding the jury's death penalty selection decision in step four of the *Tenneson* process, we further conclude that, in light of the United States Supreme Court's 1992 decision in *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), the trial court should not have allowed the jury to consider that evidence in *Tenneson* steps one through three.

### A. Background

Prior to the commencement of the sentencing phase, Dunlap announced that he would offer no evidence on nine of the twelve statutory mitigating factors listed in section 16–11–103(4).[6] He further indicated that he

---

5. *See* Colo. Const. art. 2, §§ 16, 20, 23, 25.

6. Specifically, the factors Dunlap indicated he would not argue were: § 16–11–103(4)(b) ("The

would not request jury instructions on the factors that he did not raise. Dunlap told the court that his mitigation evidence would concern only his age,[7] his cooperation with police officers,[8] and his turbulent family history.[9] Dunlap consequently argued that the prosecution could not introduce evidence regarding any factor that Dunlap did not intend to address.

The People responded that the defendant could not preclude the prosecution from introducing evidence relevant to statutory mitigating factors. They relied upon this court's ruling in *People v. Saathoff*, 790 P.2d 804 (Colo.1990), as well as the express language of section 16–11–103(1)(b), in support of their right to introduce evidence not only to prove the existence of aggravating factors, but also to rebut any enumerated statutory mitigator, regardless of whether or not Dunlap raised that mitigator.

In *Saathoff*, this court held that a defendant's prior felony convictions were admissible to rebut the subsection (4)(g) "absence of any significant prior conviction" statutory mitigator, even though the defendant had not raised it, because a jury might otherwise "conclude that the mitigator existed merely because no evidence of its non-existence was adduced." *Saathoff*, 790 P.2d at 806.

The trial court ruled for the prosecution, based on its reading of *Saathoff* and the plain language of the statute. The court further held that because *Saathoff* did not empower courts to delete mitigating factors from jury instructions, any evidence in support or negation of mitigation had to be admitted. The court granted the defense a continuing objection to any evidence introduced by the People for the purpose of rebutting statutory mitigators that Dunlap had not raised.

Subsequently, the trial court allowed the People to admit a broad range of evidence primarily to rebut the "not a continuing threat to society" mitigator in subsection (4)(k). Among the evidence introduced by the prosecution was evidence concerning: Dunlap's three prior non-adjudicated aggravated robberies and his three prior adjudicated aggravated robberies; victim responses to some of these incidents; Dunlap's bragging and excitement following some of the robberies; his alleged attempt to shoot a rival; threats that Dunlap made to prosecution witnesses; Dunlap's non-adjudicated attempt to escape from jail; his non-adjudicated sale of crack cocaine; and his acquisition, following the homicides, of a tattoo of a smoking gun with the caption "By Any Means Necessary."

When the trial court instructed the jury, it listed fourteen potential mitigating factors, including the subsection (4)(k) mitigator. The court told the jury that it could "not in any fashion consider any of these types of factors as aggravation or reasons in favor of a death sentence." Additionally, the court instructed the jury that it could consider evidence concerning Dunlap's attempted shooting of a rival, his attempted escape, his smoking gun tattoo, and his threats to prosecution witnesses solely for the purpose of rebutting the "not a continuing threat to society" mitigator. With regard to these four topics, the court instructed: "If you determine that the testimony from those witnesses has no bearing on the issue of mitigation, then you must disregard the evidence and not consider the evidence for any purpose whatsoever."

defendant's capacity to appreciate wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law was significantly impaired ...."); (4)(c) ("The defendant was under unusual and substantial duress ...."); (4)(d) ("The defendant was a principal in the offense which was committed by another, but the defendant's participation was relatively minor ...."); (4)(e) ("The defendant could not reasonably have foreseen that the defendant's conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person"); (4)(f) ("The emotional state of the defendant at the time the crime was committed"); (4)(g) ("The absence of any significant prior conviction"); (4)(i) ("The influence of drugs or alcohol"); (4)(j) ("The good faith, although mistaken, belief by the defendant that circumstances existed which constituted a moral justification for the defendant's conduct"); and (4)(k) ("The defendant is not a continuing threat to society").

7. § 16–11–103(4)(a).

8. § 16–11–103(4)(h).

9. § 16–11–103(4)(*l*).

## B. Constituttional Law

Our analysis of Dunlap's argument that the jury might have been swayed by the prosecution's efforts to rebut mitigators rests on the constitutional distinction between statutory aggravators and other aggravating evidence in the capital sentencing phase. Statutory aggravators are those factors the General Assembly has identified as weighing in favor of imposition of the death penalty. Other aggravating evidence is evidence that is unfavorable to the defendant, but that does not relate to a statutory aggravator. The Supreme Court explained the nature of this distinction in *Zant*:

> [S]tatutory aggravating [factors] play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. *But the Constitution does not require the jury to ignore other possible aggravating [circumstances] in the process of selecting, from among that class, those defendants who will actually be sentenced to death.*

*Zant*, 462 U.S. at 878, 103 S.Ct. 2733 (emphasis added).

The distinction between the admissibility of evidence for the eligibility and selection stages rests on the unique purpose of the eligibility stage. In the eligibility stage, the United States Constitution requires safeguards to ensure that the jury's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 874, 103 S.Ct. 2733 (quoting *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909). Whereas in a non-weighing state, eligibility safeguards extend through the finding beyond a reasonable doubt of at least one aggravating factor, in a weighing state, eligibility safeguards extend through the end of the weighing stage. *See Stringer*, 503 U.S at 229–32, 112 S.Ct. 1130. Thus, due to the heightened scrutiny afforded a weighing state, "the difference between a weighing State and a non-weighing State is not one of semantics." *Id.* at 231, 112 S.Ct. 1130 (internal quotation marks omitted); *see also Zant*, 462 U.S. at 890, 103 S.Ct. 2733.

Colorado's statutory scheme resembles that of a weighing state through *Tenneson* step three. Thus, we determine that the Supreme Court in *Stringer* directs us to apply such heightened scrutiny through the first three steps of our death penalty scheme. In other words, the eligibility phase continues through step three, when the jury weighs mitigating evidence against statutory aggravators. Step four, when the jury makes its final decision about life imprisonment or death, is the selection phase when all relevant evidence is permissible. *See People v. Rodriguez*, 794 P.2d 965, 986 (Colo.1990) ("Once the capital sentencing statute narrows the class of individuals eligible for the death penalty, as ours does, the federal Constitution does not prohibit the sentencer from considering aggravating facts or circumstances other than statutory aggravators.").

At steps one through three, the jury may consider: (1) evidence related to statutory aggravating factors; (2) all mitigating evidence; and (3) prosecution evidence offered to rebut mitigating factors raised by the defendant. At those steps, evidence controverting mitigating factors not raised by the defendant is irrelevant. Admission of evidence for a purpose other than to rebut the specific issues of mitigation raised by the defense has the net effect of introducing evidence relating to aggravating circumstances—not aggravating factors—at the eligibility stage. The risk is that the jury might find a statutory aggravator on the basis of aggravating circumstance evidence.

Such aggravating circumstance evidence fails to conform to the strict requirement that eligibility stage evidence "minimiz[e] the risk of wholly arbitrary and capricious action." *Zant*, 462 U.S. at 874, 103 S.Ct. 2733 (quoting *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909). Our concern in this regard is similar to that of the Supreme Court in *Stringer*: that the jury may have improperly construed the aggravating evidence to weigh in on the side of aggravating factors, thereby potentially enabling the jury to determine that Dunlap was eligible to receive the death penalty when he was not in fact within one of the "categories of murders for which a death sentence may ever be imposed." *Jurek*, 428

U.S. at 270, 96 S.Ct. 2950. Therefore, we hold that it was inappropriate for the trial court to allow the jury to consider, at *Tenneson* steps one through three, evidence introduced by the prosecution for the purpose of rebutting mitigating factors not raised by the defendant. However, because of the nature of the limiting instructions given by the trial court, we find this error to be harmless as discussed in Part IV.E. *infra.*

To the extent *Saathoff* is inconsistent with this holding, we overrule it. Aggravating circumstance evidence is admissible, but only at step four. At *Tenneson* steps one through three, the fact-finder may only consider prosecution evidence that relates to a statutory aggravator or to mitigating evidence introduced by the defendant.

### C. Admissibility of Aggravating Evidence in *Tenneson* Step Four

■■■ If a jury completes steps one through three and finds a defendant to be death eligible, then the state and federal constitutions impose few guidelines concerning the scope of aggravating evidence that the jury may consider in its selection decision. In this realm, the United States Supreme Court has deferred to state statutes, and even evidence pertaining to constitutionally protected beliefs and associations is not per se inadmissible.[10] The Court in *California v. Ramos* explained:

In returning a conviction, the jury must satisfy itself that the necessary elements of the particular crime have been proved beyond a reasonable doubt. In fixing a penalty, however, there is no similar "central issue" from which the jury's attention may be diverted. Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, as did respondent's jury in determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.

463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (footnote omitted); *see also Barclay,* 463 U.S. at 956, 103 S.Ct. 3418 (holding that "nothing in the United States Constitution prohibited the trial court from considering [the defendant's] criminal record," even though that record was not relevant to any of Florida's statutorily enumerated aggravating factors).

Thus, we turn not to constitutional considerations but to our own statute in order to determine the scope of admissible evidence for purposes of *Tenneson* step four. Section 16–11–103(1)(b) states in pertinent part:

All admissible evidence presented by either the prosecuting attorney or the defendant that the court deems relevant to the nature of the crime, and the character, background, and history of the defendant, including any evidence presented in the guilt phase of the trial, and any matters relating to any of the aggravating or mitigating factors enumerated in subsections (4) and (5) of this section may be presented. Any such evidence which the court deems to have probative value may be received, as long as each party is given an opportunity to rebut such evidence.

§ 16–11–103(1)(b). The plain language of the statute envisions that either the prosecution or the defendant may introduce evidence that is "relevant to the nature of the crime, and the character, background, and history of the defendant" and "any matters relating to any of the aggravating or mitigating factors." *Id.* This plain language interpretation is supported by the statute's legislative history.

Subsection (1)(b) was enacted into law in 1984 as part of House Bill 1310. Representative Michael Bird, the sponsor of the bill, explained to the House Committee on the Judiciary that the new evidentiary provision in subsection (1)(b) was one of the areas in the Bill representing "the most dramatic amount of change." *See Hearing on House Bill 1310, House Committee on Judiciary*

---

**10.** *See Dawson v. Delaware,* 503 U.S. 159, 165, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992) (holding that evidence of a defendant's membership in a white supremacist prison gang was not per se inadmissible in the sentencing stage of a capital trial, but that it must meet traditional evidentiary relevance requirements).

(Feb. 9, 1984). Representative Bird explained the purpose of the change:

> We're all fairly familiar that a judge, when he considers sentencing a particular individual, [has] a rather extensive background [of the defendant] and all of that information is available to the judge for sentencing purposes. This [provision] basically does the same thing. It allows everything that's relevant in the nature of the crime and the character of the defendant to be available to the jury for consideration.

*Id.*

In the Senate Committee on the Judiciary hearings that followed, Senator Jeff Wells observed that subsection (1)(b)'s broad concept of relevance would enable prosecutors to introduce evidence of prior non-adjudicated crimes as long as the judge found the crimes relevant to a mitigating factor or to the character of the defendant. *See Hearing on House Bill 1310, Senate Committee on the Judiciary* (Feb. 29, 1984). In response to concerns raised by Senator Wells's observation, Deputy District Attorney Steve Henry indicated that broad admissibility of evidence would be tempered by court-enforced concepts of evidentiary relevance. Assistant District Attorney George Vasholtz further clarified to the Committee that both good and bad character evidence would be relevant under the new act: "Right now, the way the law stands underneath the rules of evidence, unless they bring forward some good character evidence, we have no chance to show what kind of bad person this person is. So [subsection (1)(b) is] employed for the People." *Id.*

It is clear from the legislative history of House Bill 1310 that the General Assembly intended that the courts of this state interpret section 16–11–103(1)(b) according to its plain meaning. The import of the broad definition of relevance in subsection (1)(b) was apparent to the legislators. The members of the House and Senate Committees on the Judiciary understood that the Bill defined admissible evidence in the broadest sense, enabling the jury to make its solemn life or death decision with all relevant and constitutionally admissible evidence.

Hence, we now determine that the admissibility of rebuttal mitigation evidence for purposes of *Tenneson* step four is constrained only by familiar evidentiary principles concerning the relevance of the evidence and the potential for that evidence to inflame the passion or prejudice of the jury.

Relevant evidence in this setting necessarily comprises the good as well as the bad. Only by considering "all relevant information about the individual defendant whose fate it must determine," *Jurek*, 428 U.S. at 271, 96 S.Ct. 2950, may a jury make an individualized determination of whether the particular defendant should receive the death sentence or life imprisonment.

### D. Admissibility of Relevant Evidence

Within this conceptual framework, we turn now to the question of what evidence the trial court should have permitted the jury to consider, and for what purpose.

We first hold that under CRE 401, all of the aggravating evidence introduced by the prosecution in this case was relevant and was admissible for consideration by the jury at step four. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Nonetheless, CRE 403 states that trial courts may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Trial courts have broad discretion in this area. *See, e.g., People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993). "Absent an abuse of discretion, a trial court's ruling concerning the relative probative value and prejudicial impact of the evidence will not be disturbed on review." *People v. Gibbens*, 905 P.2d 604, 607 (Colo.1995). In fact, to show that a court abused its discretion by erroneously admitting evidence, a party must show that the court's decision was "manifestly arbitrary, unreasonable, or unfair." *People v. Czemerynski*, 786 P.2d 1100, 1108 (Colo.1990) (quoting *King v. People*, 785 P.2d 596, 603 (Colo.1990)). "Unfair prejudice" has a specific meaning in this context:

The trial court should not exclude proffered evidence as unfairly prejudicial simply because it damages the defendant's case. All effective evidence is prejudicial in the sense of being damaging or detrimental to the party against whom it is offered. Proffered evidence which calls for exclusion as unfairly prejudicial is given a more specialized meaning of an undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.

*People v. District Court*, 785 P.2d 141, 147 (Colo.1990) (citations omitted).

The trial court admitted the aggravating circumstance evidence as relevant to rebut mitigating factors. We have concluded that the proper inquiry demanded for admission of such evidence at step four is whether the evidence is relevant to any of the categories listed in section 16–11–103(1)(b), including the "character, history, and background of the defendant." § 16–11–103(1)(b).

The evidence of Dunlap's past violent crimes, his lack of remorse following those crimes, his attempt to escape from jail, his threats to witnesses warning them not to assist the prosecution, and his decision to acquire a tattoo of a handgun with the caption "By Any Means Necessary" was relevant to Dunlap's propensity for violence and his continuing threat to society.[11] Accordingly, the application of Rules 401 through 403 to the evidence in this case leads to the conclusion that the trial court did not abuse its discretion by admitting the evidence Dunlap now challenges.[12]

At step four, the jury was entitled to consider this evidence, in conjunction with all of the other evidence offered by the People and by Dunlap, in its life or death decision concerning this particular death-eligible defendant. *See Zant*, 462 U.S. at 878, 103 S.Ct. 2733 ("[T]he Constitution does not require the jury to ignore . . . aggravating factors in

the process of selecting, from among [the class of death-eligible defendants], those defendants who will actually be sentenced to death."). Thus, we conclude that all of the aggravating circumstance evidence was relevant, was not overly prejudicial, and was therefore properly admissible for purposes of the jury's deliberations at step four.

### E. Error Analysis

We concluded in Part IV.B. *supra* that the trial court should not have permitted the jury to consider in its eligibility decision at steps one through three aggravating circumstance evidence introduced by the People to rebut mitigating factors that Dunlap did not raise. Hence, we must now determine whether the trial court's failure to instruct the jury that it could not consider the evidence in question during the jury's eligibility deliberations resulted in reversible error. The error pertains not to the admissibility of the evidence Dunlap challenges, but rather to the jury's potential consideration of that evidence during its eligibility stage deliberations.

 Because the trial court granted Dunlap a continuing objection as to the entry of this evidence at trial, we consider the court's admission of the evidence using harmless error analysis. We conclude that the court's failure to instruct the jury not to consider this evidence during the eligibility stage was harmless beyond a reasonable doubt.

 We reach this conclusion because we find that the jury instructions precluded the jury from weighing the evidence in question as aggravating evidence during steps one through three. After listing the fourteen different mitigating factors, the trial court instructed the jury that it could "not *in any fashion* consider any of these types of factors as aggravation or reasons in favor of a death sentence." (Emphasis added.) Moreover, after listing the four specific types of rebuttal

---

**11.** *See also Dawson*, 503 U.S. at 166, 112 S.Ct. 1093 (noting that a defendant's future threat to society may be relevant to a jury's capital sentencing decision).

**12.** Moreover, the trial court took steps consistent with CRE 403 to exclude some evidence and to

ensure that other evidence was not unduly laden with emotion; for instance, the court did not permit one victim of Dunlap's Burger King robbery to testify because she had cried on the stand while testifying during the trial of that case.

of mitigation evidence—the smoking gun tattoo, Dunlap's attempted escape, his drive-by attempted shooting of a rival, and his threats to witnesses—the court instructed the jury that:

> You may not consider the testimony from those witnesses testifying on the above-listed matters as an aggravating factor.
>
> If you determine that the testimony from those witnesses has no bearing on the issue of mitigation, then you must disregard the evidence and not consider the evidence for any purpose whatsoever.

Because there was no evidence to the contrary, we presume that the jury understood and heeded its instructions. *See Bohrer v. DeHart,* 961 P.2d 472, 478 (Colo.1998); *Bear Valley Church of Christ v. DeBose,* 928 P.2d 1315, 1331 (Colo.1996); *People v. Palmer,* 189 Colo. 358, 360, 540 P.2d 341, 342 (1975).

The subsection (4)(k) "not a continuing threat to society" mitigator, under which the trial court admitted most of the improperly considered aggravating circumstance evidence, provides a helpful example of the potential impact of the jury instruction. Because Dunlap introduced no evidence to show that he was not a continuing threat to society, whereas the prosecution introduced substantial evidence showing that Dunlap was a threat to society, the jury could have determined that Dunlap was a continuing threat to society. However, whether a defendant is a continuing threat to society is not among the statutory aggravators enumerated by our legislature in section 16–11–103(5). Therefore, it would have been improper for the jury to consider evidence that Dunlap was a continuing threat for purposes of determining Dunlap's eligibility to receive the death sentence.

The subsection (4)(g) "absence of any significant prior conviction" mitigator provides an additional example. The prosecution introduced evidence to rebut an inference that Dunlap did not have prior convictions, even though Dunlap did not raise that mitigator.

The jury could have concluded from that evidence that Dunlap did indeed have prior convictions. However, the jury was specifically precluded from using that conclusion in support of a death sentence.[13] The trial court clearly instructed the jury that it could not consider any evidence regarding mitigating facts as aggravation or in support of the death penalty. Furthermore, the trial court instructed the jury that in step three it could only weigh "the specified aggravating factor or factors against any or all mitigating factor or factors."

Hence, the trial court averted the danger envisioned by the Supreme Court in *Stringer* that aggravating circumstance evidence would find its way into the balance in favor of death. We therefore find beyond a reasonable doubt that the error here was harmless.

## V. Inflammatory Evidence

Dunlap next contends that even if the statute allows the introduction of a broad range of the evidence, the prosecution's introduction of two types of inflammatory evidence was so unfairly prejudicial to his case that it created the substantial risk of an arbitrary verdict. The evidence in question concerned: (1) two tattoos that Dunlap acquired while in jail awaiting his capital trial; and (2) the impact of Dunlap's prior crimes on the emotional state of the victims of those crimes. We addressed in Part IV.E. *supra* the admissibility of the tattoo and the evidence of the prior crimes themselves in the context of rebutting the (4)(k) statutory mitigator. We now address in greater detail the question of whether the evidence of Dunlap's tattoo and the evidence of the impact he had on the victims of his prior crimes was admissible under CRE 401 through 403. We also address here Dunlap's contention that the People committed prosecutorial misconduct by erroneously introducing inflammatory photographs of the victims of his homicides.

### A. Tattoo Evidence

The court allowed the People to introduce into evidence photographs and testimony

---

13. We clarify that we are not addressing the Burger King conviction here. The Burger King conviction was not offered to rebut a mitigating factor, but rather to prove the subsection (5)(b) aggravating factor of prior conviction of a class one or two felony involving violence. Therefore, the jury properly could have considered that conviction in support of the death penalty.

concerning two tattoos that Dunlap acquired while in jail awaiting trial. The first tattoo, labeled "Crazy Horse," was an illustration of a horse smoking a cigarette. The second, containing the phrase "By Any Means Necessary," depicted a smoking handgun like the one used in the homicides.

Dunlap argues that the tattoo evidence was inflammatory and inherently ambiguous. The People respond that the "Crazy Horse" tattoo was relevant to identify Dunlap as the author of threatening letters sent to a prosecution witness signed "Crazy Horse" and that the smoking gun tattoo was relevant as circumstantial evidence to rebut the subsection (4)(k) "not a continuing threat to society" mitigator.

 We conclude that the "Crazy Horse" tattoo was admissible under CRE 401 through 403. Prosecution witness Miguel Kirkpatrick, Dunlap's cellmate during a portion of the time that Dunlap was awaiting trial on the homicide charges, testified that following his jail discussions with Dunlap, he received letters containing threats aimed at discouraging him from cooperating with the prosecution on Dunlap's case. The first letter was unsigned, but the second letter was signed "Crazy Horse," which Kirkpatrick testified was Dunlap's nickname while in jail. During the guilt phase of the trial, the trial court properly admitted both letters into evidence with some redactions. *See People v. Lowe*, 660 P.2d 1261, 1265 (Colo.1983) ("Threats against a witness are . . . admissible to show consciousness of guilt."). In order to help establish Dunlap's authorship of the letters, the court also allowed the prosecution to introduce a picture of Dunlap's "Crazy Horse" tattoo into evidence. This tattoo was relevant to show "through a series of reasonable inferences" that Dunlap was the author of the threatening letters. *Id.; see also State v. Skinner*, 734 S.W.2d 877, 882–83 (Mo.Ct.App.1987) (holding that testimony concerning a symbol in the defendant's tattoo was relevant to prove author-

ship of threatening letters containing the same symbol). Furthermore, the evidence of the tattoo had little, if any, prejudicial effect, for it depicted simply a horse's head beneath the words "Crazy Horse."

 The smoking gun tattoo presents a closer balance between probative value and unfair prejudicial effect, but again we find no error. The jury could have concluded that the tattoo related to Dunlap's remorse or lack of remorse about his crime, and thus circumstantially to the nature of his continuing threat to society. Furthermore, its prejudicial effect was limited by the trial court's instruction that the jury only consider the tattoo for purposes of rebutting the subsection (4)(k) "not a continuing threat to society" mitigator. As noted above, we presume that juries understand and heed jury instructions. *See Bohrer*, 961 P.2d at 478; *Bear Valley Church of Christ*, 928 P.2d at 1331; *Palmer*, 189 Colo. at 360, 540 P.2d at 342.

We hold that the trial court did not abuse its discretion by admitting the evidence of Dunlap's tattoos under the relevancy standards of section 16–11–103(1)(b) and CRE 401 through 403.

### B. Victim Impact Evidence

Dunlap also contends that the trial court improperly admitted inflammatory victim impact evidence from the victims of Dunlap's prior crimes. The evidence consisted of two instances in which victims of Dunlap's prior crimes testified as to their fear or nervousness during those crimes, and one instance in which an officer testified as to a victim's emotional state when he encountered her following an aggravated robbery. We agree that this evidence was improperly admitted, but we find that the admission of this evidence was harmless error.

 Evidence regarding the impact of a capital murder on the victim's family members is relevant in the penalty phase of the defendant's trial.[14] Such evidence allows the

---

**14.** *See Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's deci-

sion as to whether or not the death penalty should be imposed.").

Because the general admissibility of victim impact evidence from the family members of homicide victims is now well-established in the con-

jury to consider "the human cost of the crime of which the defendant stands convicted." *Payne*, 501 U.S. at 827, 111 S.Ct. 2597. Evidence consisting of facts concerning a defendant's prior convictions is also relevant in the penalty phase, because it addresses the defendant's character as well as the existence of the statutory aggravators and mitigators related to the defendant's prior record. *See* § 16–11–103(1)(b), (4)(g), (5)(b).

 Evidence regarding the impact of a capital defendant's prior crimes on the victims of those crimes, however, is not admissible because it is not relevant to the actual harm caused by the defendant as a result of the homicide for which he is being sentenced. *See Payne*, 501 U.S. at 821, 111 S.Ct. 2597. Past victims' perceptions of Dunlap were not sufficiently tied to the jury's inquiry concerning the character, background, and history of the defendant, or to any of the aggravating or mitigating factors enumerated in section 16–11–103(4) and (5). Given the facts of this case, we agree with the Supreme Court of Illinois that "while

'evidence about the victim and about the impact of the murder on the victim's family [was] relevant to the jury's decision as to whether or not the death penalty should [have been] imposed,' . . . evidence about victims of other, unrelated offenses [was] irrelevant and therefore inadmissible." *People v. Hope*, 184 Ill.2d 39, 234 Ill.Dec. 379, 702 N.E.2d 1282, 1289 (1998) (quoting *Payne*, 501 U.S. at 827, 111 S.Ct. 2597). Thus, we conclude that although the facts detailing Dunlap's prior crimes were properly admitted, evidence regarding the perceptions of the victims of those crimes was not.

 Having come to this conclusion, we must determine whether the admission of this evidence by the trial court amounted to reversible error. The error is preserved for review because the trial court granted Dunlap a continuing objection to any issue concerning the admissibility under CRE 401 through 403 of evidence rebutting mitigating factors as well as any issue concerning the application of *Saathoff* to that evidence.[15]

text of the capital murder sentencing phase, we decline to address in detail Dunlap's contention that the impact of such evidence in his trial was unduly repetitious and prejudicial. *See Payne*, 501 U.S. at 825, 111 S.Ct. 2597 (holding that "[i]n the majority of cases, . . . victim impact evidence serves entirely legitimate purposes"). The Court in *Payne* noted that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* In this case, the People introduced witnesses at trial who described the condition of each of the four victims in the hours following the shootings. These witnesses testified, for example, to the Crowell family's decision to keep their daughter on life support so that family members would have an opportunity "to say goodbye" and to the Grant family's decision to donate their son's organs. In the context of a quadruple homicide, we find that the trial court did not abuse its discretion by allowing the prosecution to introduce such evidence concerning the impact of Dunlap's crime on each of the victims and their families. *See United States v. McVeigh*, 153 F.3d 1166, 1221 (10th Cir.1998) (holding that "allowing . . . a substantial amount of victim impact testimony reflecting the magnitude of . . . a large-scale crime" does not violate the limits on such testimony set forth in *Payne* ).

15. The trial court granted Dunlap a continuing objection with regard to the argument that the prosecution's rebuttal evidence of mitigating fac-

tors was inadmissible under this court's ruling in *Saathoff*. The wording of the trial court's ruling was ambiguous with respect to potentially broader interpretations of the continuing objection: "The Court grants the defense a continuing objection as raised this morning on *all the issues that they have raised*." To that point in the day's proceedings, after 18 pages of transcript in the record, the defense had raised several issues that it may have perceived the trial court to have incorporated in its grant of the continuing objection.

We are reluctant to read the scope of that grant narrowly in light of the nature of the sentencing proceeding and the reliance that Dunlap may have placed on the grant when subsequently making his decisions whether or not to object to evidence the prosecution introduced. *See Rodriguez*, 794 P.2d at 972. During the hearings on the morning in question, defense counsel discussed CRE 401 through 403 objections to the testimony of the witnesses of Dunlap's prior crimes. Thus, we treat the trial court's grant of the continuing objection as valid for purposes of preserving on appeal errors pertaining to the CRE 403 admissibility of the victim impact evidence here in question.

However, as a matter of judicial policy, we disfavor the use of continuing objections for purposes of allowing the introduction of evidence with questionable relevance under CRE 403. *See McVeigh*, 153 F.3d at 1200 ("[C]ontinuing objections are generally considered inappropriate for preserving error on appeal under [Federal Rule

Hence, we apply the harmless error standard. *See Davis*, 794 P.2d at 189.

█ We find beyond a reasonable doubt that the testimony in question did not influence the sentencing decision or impair the fairness of the penalty phase of Dunlap's case. The testimony consisted of three isolated illustrations of emotional reactions that were well within the predictable norm of human responses to crimes such as aggravated robbery. The jury was not likely surprised, shocked, or horrified to learn that in a prior criminal episode after Dunlap screamed, "I said get down," while wielding a handgun, the victim "got down" because she "was afraid." Similarly, it would not likely surprise, let alone prejudice, a jury to learn the reaction of the second victim after she was robbed. According to the first police officer on the scene: "She was frightened, scared, excitable, and in fact, I had a hard time understanding her. I had to calm her down to get the information I needed from her." The jury also learned the unremarkable fact that when Dunlap pulled aside a third victim at gunpoint to open a safe, it took the victim "a little while" because he was a "little nervous." We find that the nature of all of this evidence was not prejudicial, even when we consider it in isolation.

Further, this improper evidence must be considered in the context of the entire trial record, and there its impact is de minimis. The jury heard victim impact evidence and argument concerning the victims of Dunlap's quadruple homicide, including evidence that Dunlap shot seventeen-year-old Colleen O'Connor through the top of the head while she knelt before him begging for her life. They heard testimony concerning Dunlap's own words describing O'Connor's reaction to this incident: "She went out like a soldier." They heard evidence concerning various statutory aggravating factors, including contextual evidence concerning six prior aggravated robberies. In light of the entire record, we find beyond a reasonable doubt that the trial court's erroneous admission of victim impact evidence from the victims of Dunlap's prior crimes did not affect the decision of the jury to impose the sentence of death upon Dunlap.

## C. Photographic Evidence

Dunlap also contends that the People committed prosecutorial misconduct by displaying photographs of the victims to the jury. The trial court overruled Dunlap's multiple CRE 403 objections to the photographs. We find that the trial court did not abuse its discretion by admitting the photographs of the victims. We also find that the People committed no prosecutorial misconduct in introducing the photographs.

█ The court admitted one photograph of each entry wound on each of the victims. The photographs depicted the wounds after they had been cleaned of blood. The court also admitted a photograph of Marge Kohlberg lying on the ground in a pool of blood, showing where Dunlap emptied her purse around her body. Another exhibit depicted Ben Grant's broken glasses and his visor cap in a pool of blood. Finally, four pictures showed paramedics treating the victims.

In *People v. Roark*, 643 P.2d 756, 762 (Colo.1982), we noted the general rule that:

> photographs are admissible to depict graphically anything a witness may describe in words, provided that the prejudicial effect of the photographs does not far outweigh their probative value. The determination of admissibility is committed to the sound discretion of the trial judge.

(citations omitted); *see also People v. Mattas*, 645 P.2d 254, 260 (Colo.1982) ("It is within the trial court's discretion to decide whether photographs are unnecessarily gruesome or inflammatory, and the court's decision will be reversed only upon abuse of that discretion."); *Young v. People*, 175 Colo. 461, 475–76, 488 P.2d 567, 574 (1971) ("It is well-established that photographs may be used to

of Evidence] 403"). The Federal Rule is identical to CRE 403. As the Tenth Circuit Court of Appeals explained:

> [T]he considerations bearing upon a decision whether to admit or exclude evidence under Rules 404(b) and 403 are sufficiently complex

that ordinarily neither counsel nor the trial court should rely on a standing objection with respect to evidence coming within the purview of these rules.

*Id.* (quoting *United States v. Mangiameli*, 668 F.2d 1172, 1177 (10th Cir.1982)).

graphically portray, among other things, the scene of a crime, the identification of a victim, the appearance and condition of the deceased, and the location, nature and extent of the wounds or injuries, all of which matters are relevant.").

We find that the exhibits Dunlap challenges were relevant to show the crime scene, the victims' identities, the injuries to the victims, and the locations of their personal possessions. In the sentencing phase, the pictures helped to demonstrate the deliberate, execution-style manner in which Dunlap committed the shootings, thus assisting the jury in its consideration as to whether Dunlap presented a continuing threat to society. Moreover, these photographs were not particularly shocking in the context of a murder: the entry wounds depicted were approximately one-half centimeter in diameter and were nearly clean of blood.

Because we do not find the potential inflammatory effect of the photographs to substantially outweigh their probative value, we uphold the trial court's decision to admit the exhibits, and accordingly, we find no prosecutorial misconduct.

## VI. Statutory Aggravators

### A. Doubling of Aggravators

■ Dunlap claims that the trial court erred by submitting to the jury three separate statutory aggravators on the basis of a single factual aspect of his conduct. The three aggravators Dunlap challenges in this regard are: (1) that he caused the death of a person in the course of committing aggravated robbery, see § 16–11–103(5)(g); (2) that he caused the death of a person in the course

of committing first degree burglary, see § 16–11–103(5)(g); and (3) that he committed murder for pecuniary gain, see § 16–11–103(5)(h).[16] He alleges that because each of these aggravating factors arose from the same underlying conduct, the trial court allowed an impermissible "doubling" of factors. This doubling, he argues, violated his rights to due process and to protection against cruel and unusual punishment under both the state and federal constitutions.[17] We reject this argument.

In response to a similar argument regarding duplicative aggravators in *Davis*, we held that "the doubling up of aggravators is not legally significant under the Colorado death penalty procedure." *Davis*, 794 P.2d at 189 (holding that the submission to the jury of both a felony murder aggravator under section 16–11–103(5)(g) and a kidnapping aggravator under section 16–11–103(5)(d) was proper despite the fact that the felony of kidnapping was the basis of both factors). We noted that the trial court instructed the jury that it was to consider the weight it assigned to each factor rather than the number of factors when conducting its weighing analysis. *See id.* The trial court's instruction allowed the jury to consider aggravating factors that the jury found to exist beyond a reasonable doubt, but prevented the sheer number of factors from artificially inflating the manner in which the jury weighed the aggravators. *See id.* Thus, we held that there was no substantial risk that the death penalty would be imposed in an arbitrary and capricious manner. *See id.* at 188 (citing *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909).

---

**16.** We address and reject Dunlap's contention that submitting felony murder aggravators in a case in which the defendant has been convicted of felony murder and intentional murder fails to adequately channel death penalty eligibility. We note that in considering the fact that a defendant committed a felony in addition to an intentional murder, a jury would be likely to conclude that the defendant was more blameworthy than a murder defendant who did not also commit burglary and robbery. Thus, even in a case in which a defendant was convicted of intentional and felony murder, submitting a felony murder aggravator at the penalty phase serves to "genuinely narrow the class of persons eligible for the death penalty and ... [to] justify the imposition

of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877, 103 S.Ct. 2733 (describing the necessity of avoiding vague standards that would result in an unconstitutionally arbitrary and capricious sentencing scheme); *see also Davis*, 794 P.2d at 188–89 (allowing the submission of a felony murder aggravator despite the fact that the defendant had received both felony murder and first degree murder convictions); *Rodriguez*, 794 P.2d at 983 (same).

**17.** *See* U.S. Const. amends VIII, XIV; Colo. Const. art. II §§ 20, 25.

■ The same reasoning applies here. Dunlap is correct that the jury found the existence of two aggravators that addressed largely duplicative conduct. The pecuniary gain aggravator under subsection (5)(h) would, in most instances, subsume the felony murder in the course of a robbery aggravator under subsection (5)(g).[18] However, in this case, as in *Davis*, the trial court instructed the jury that it was to consider the weight of each factor, rather than the number of factors, in determining whether the mitigating factors outweighed the aggravators:

> In the third step of your deliberations you must weigh the specified aggravating factor or factors found to exist against the mitigating factor or factors. This is not a mere counting process in which the numbers of aggravating factors are weighed against numbers of mitigating factors.
>
> The number of factors found is not determinative. You may emphasize one factor more than another in a particular case, giving each factor as little or as much weight as you deem appropriate....
>
> Each of you must decide for yourself what weight to give any aggravating or mitigating factor or factors.

As we have previously indicated, we presume that the jury understood and followed the trial court's instructions. *See Bohrer*, 961 P.2d at 478; *Bear Valley Church of Christ*, 928 P.2d at 1331; *Palmer*, 189 Colo. at 360, 540 P.2d at 342.

In this regard, we agree with the Tenth Circuit's conclusion in *Davis v. Executive Director*:

> We assume that the jury did not blindly or unthinkingly add up the total number of aggravators, and weigh that number against the number of mitigators. Rather, we assume they followed the instructions

to critically evaluate each factor, applying their "common sense understanding" to their obligation to weigh aggravating and mitigating factors.

100 F.3d 750, 774 (10th Cir.1996). In that case, the Tenth Circuit reviewed the habeas corpus petition of the capital defendant whose conviction we affirmed in *Davis*, 794 P.2d at 188. The Tenth Circuit held that the submission of duplicative aggravators was a constitutional error because "Colorado's capital sentencing scheme contains a crucial weighing component," but held that this error was harmless in light of the entire record of that case.[19]

Dunlap contends that the Tenth Circuit's holding in *Davis v. Executive Director* requires this court to revisit our 1990 holding in *Davis*. In support of this contention, he cites two additional post–1990 decisions from federal circuit courts of appeal holding that the doubling of aggravators is impermissible under a weighing scheme. *See United States v. Tipton*, 90 F.3d 861, 899 (4th Cir.1996); *United States v. McCullah*, 76 F.3d 1087, 1112 (10th Cir.1996). We reject Dunlap's contention.

■ We note first that this court is not bound by a federal circuit court's interpretation of federal constitutional requirements. *See People v. Barber*, 799 P.2d 936, 940 (Colo.1990) ("Lower federal courts do not have appellate jurisdiction over state courts and their decisions are not conclusive on state courts, even on questions of federal law."). However, the Tenth Circuit must accept our interpretation of the manner in which section 16–11–103(2)(a)(II) balances aggravating and mitigating factors, and we must determine, at least initially, the effect that jury instructions might have upon a jury's consideration of that balance. *See*

18. The only exception would be the unusual criminal who commits a robbery, thus taking something of value from another, but does so for purposes other than pecuniary gain. *See* § 18–4–301, 6 C.R.S. (1998) ("A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits robbery.").

19. *See Davis v. Executive Director*, 100 F.3d at 774. Subsequently, the Tenth Circuit clarified that its holding was not "that any time evidence

supports more than one aggravating circumstance, those circumstances impermissibly overlap, per se." *Cooks v. Ward*, 165 F.3d 1283, 1998 WL 869691, at *5 (10th Cir. Dec.15, 1998). The Court explained that its test is "not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." *Id.* (quoting *United States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir.1996)).

*Wainwright v. Goode,* 464 U.S. 78, 84, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) (holding that "the views of the State's highest court with respect to state law are binding on the federal courts").

The jury instructions in this case were sufficient to advise the jury that the weighing process in section 16–11–103(2)(a)(II) rests not on a simple counting of aggravating and mitigating factors, but rather upon a qualitative determination of whether the *aggregate* weight of any mitigating factors is greater than the *aggregate* weight of any aggravating factors proven beyond a reasonable doubt. We do not share the Tenth Circuit's concern that, despite explicit limiting jury instructions, "the mere finding of an aggravating factor cannot but imply a qualitative value to that factor." *McCullah,* 76 F.3d at 1112.

Thus, we apply the holding we reached in *Davis,* and conclude that the trial court did not err in submitting to the jury statutory aggravators that were based on the same underlying factual circumstances.

### B. Alleged Vagueness of Aggravators

■ Before a defendant is eligible for the death penalty under the Eighth Amendment, the trier of fact must convict him of murder and find at least one aggravating factor. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630. The finding of an aggravating factor "narrows the categories of murders for which a death sentence may ever be imposed." *Jurek,* 428 U.S. at 270, 96 S.Ct. 2950. To achieve this objective, an aggravating factor must satisfy two conditions: (1) it must apply only to a subclass of defendants convicted of murder, not to every convicted murder defendant; and (2) it must not be unconstitutionally vague. *See Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630; *Maynard v. Cartwright,* 486 U.S. 356, 361–64, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Dunlap alleges that the "grave risk of death" and "lying in wait" aggravators violated the vagueness requirement.[20]

20. *See* § 16–11–103(5)(i), (f).

21. § 16–11–103(5)(i). The trial court submitted this aggravator to the jury in reference to Bobby

■ The Court held in *Tuilaepa* that the controlling objective when examining vagueness of statutory aggravators is to determine whether the narrowing process "is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. 2630. In this regard, the Court explained:

Because "the proper degree of definition" of eligibility and selection factors often "is not susceptible of mathematical precision," our vagueness review is quite deferential. [*Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *see Gregg,* 428 U.S. at 193–194, 96 S.Ct. 2909] (factors "are by necessity somewhat general"). Relying on the basic principle that a factor is not unconstitutional if it has some "common-sense core of meaning ... that criminal juries should be capable of understanding," *Jurek v. Texas,* 428 U.S. 262, 279 [96 S.Ct. 2950, 49 L.Ed.2d 929] (1976) (White, J., concurring in judgment), we have found only a few factors vague, and those in fact are quite similar to one another. [*See Maynard v. Cartwright,* 486 U.S. 356, 363–364, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) ] (question whether murder was "especially heinous, atrocious, or cruel"); [*Godfrey v. Georgia,* 446 U.S. 420, 427–429, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ] (question whether murder was "outrageously or wantonly vile, horrible and inhuman"); [*cf. Arave v. Creech,* 507 U.S. 463, 472, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) ] ("We are not faced with pejorative adjectives ... that describe a crime as a whole").

*Id.* at 973–74, 114 S.Ct. 2630. We now address Dunlap's allegations of vagueness under this framework of review.

#### 1. Grave Risk of Death

■ Dunlap first raises a vagueness challenge to the "grave risk of death" aggravator, which states, "In the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense."[21]

Stephens and described it as requiring that in commission of the offense, the defendant knowingly created "a grave risk of death to another

Dunlap argues that because Bobby Stephens was an intended victim of the crime, the risk of death to Stephens was not the kind of risk contemplated in the statute.

Dunlap notes that in *Gregg v. Georgia*, the Supreme Court stated that a similar aggravator in Georgia's statute, which applied when a defendant created a "great risk of death to more than one person," was susceptible to an overbroad interpretation. *See Gregg*, 428 U.S. at 202, 96 S.Ct. 2909. Because the Georgia Supreme Court had construed the statute narrowly, however, the Court rejected the defendant's vagueness challenge. *See id.* at 202–03, 96 S.Ct. 2909.

Dunlap contends that unlike the Georgia Supreme Court, we have not issued a narrowing construction of the "grave risk of death" aggravator,[22] and he urges us to adopt the limitations established in other states. Specifically, Dunlap argues that this court should interpret the "grave risk of death" aggravator not to apply when the other person endangered was a victim or intended victim of the criminal conduct. *See State v. Brewer*, 170 Ariz. 486, 826 P.2d 783, 797 (1992) (refusing to apply Arizona's "grave risk of death" aggravator to the defendant's conduct in causing the death of his victim's unborn fetus because the fetus was also an intended target of the defendant's crime). Under such an interpretation, the risk of death Dunlap created for Bobby Stephens could not be the basis for applying this ag-

gravator because Stephens was one of Dunlap's intended victims.[23]

We find this argument unpersuasive. The statutory scheme set out in section 16–11–103 delineates procedures for imposing sentences for *class one* felonies, and the "offense" to which the subsection (5)(i) aggravator refers must therefore be a class one felony. *See City of Grand Junction v. Sisneros*, 957 P.2d 1026, 1028 (Colo.1998) (holding that a statute must be construed as a whole, giving "consistent, harmonious, and sensible effect to all of its parts"). The class one felonies of which Dunlap was convicted were the murders of Sylvia Crowell, Ben Grant, Colleen O'Connor, and Marge Kohlberg. Although Bobby Stephens was a victim of Dunlap's crimes, he was a victim of attempted murder, which is a class two felony. Hence, Stephens was a person "in addition to" the victims of Dunlap's murder offenses. This interpretation is consistent with the principle that aggravating factors must narrow the class of persons eligible for the death penalty to a subset of murderers who are more culpable than the entire class of murder defendants. *See Jurek*, 428 U.S. at 270, 96 S.Ct. 2950. Because Dunlap created a grave risk of death to Stephens in addition to killing four people, he is more culpable than he would have been had he killed four people without also seriously endangering Stephens.

Thus, the "grave risk of death" aggravator applies to Dunlap under the common sense interpretation of the text: a reasonable jury

---

person in addition to the victim of the offense, to wit, Bobby Stephens."

**22.** We note at the outset that contrary to the implication of Dunlap's argument, the *Gregg* Court did not uphold Georgia's "great risk of death" aggravator because the Georgia Supreme Court actually had rendered a narrow interpretation of the aggravator. Rather, it did so because the Georgia courts had not construed it broadly. *See Gregg*, 428 U.S. at 202–03, 96 S.Ct. 2909 (citing *Jarrell v. State*, 234 Ga. 410, 216 S.E.2d 258, 269 (1975), a kidnapping/murder case in which the Georgia Supreme Court did not apply the aggravator because "[t]here [was] no evidence to support the findings that the offender knowingly created a great risk of death to more than one person in a public place"). We do not read *Gregg* as requiring a court to issue a narrow construction of an aggravator such as this one in order to withstand a vagueness challenge. This

interpretation is consistent with the Supreme Court's decisions subsequent to *Gregg*. *See* discussion of *Tuilaepa*, Part VI.B. *supra*.

**23.** Dunlap does not challenge the fact that when he shot Bobby Stephens he knew he was putting him at "grave risk of death." Indeed, we have previously held that the "grave risk of death" language is not unconstitutionally vague, because it is a phrase employing "words that are common and easily understood by persons familiar with the English language." *Davis*, 794 P.2d 159, 175 (upholding against a vagueness challenge the mitigating factor that the defendant could not reasonably have foreseen that his conduct "would cause, or would create a grave risk of causing, death to another person") (quoting *People v. Drake*, 748 P.2d 1237, 1267 (Colo.1988) (Rovira, J., concurring in part and dissenting in part)).

could find that by shooting Bobby Stephens, Dunlap created a grave risk of death to a person other than the victims of his class one felonies. We therefore find no merit in Dunlap's contention that the subsection (5)(i) aggravator is unconstitutionally vague.

### 2. Lying in Wait

Dunlap also raises a vagueness challenge to the subsection (5)(f) aggravator, which applies in situations where "[t]he defendant commit[s] the offense while lying in wait, [or] from ambush." [24] He claims that this aggravator "utilizes terms with no common sense meaning capable of consistent application," and does not inform the jury of what it must find to impose the death penalty.[25]

■ Contrary to Dunlap's contention, however, the terms "lying in wait" and "ambush" have well-founded roots in common and legal parlance, and thus the aggravator has a "common-sense core of meaning ... that criminal juries should be capable of understanding." *Jurek*, 428 U.S. at 279, 96 S.Ct. 2950 (White, J., concurring in the judgment). The phrase "lying in wait" has been used throughout the history of criminal law to distinguish a more culpable class of murderers from the set of all murder defendants.[26] Indeed, the concept of murder by lying in wait or from ambush now has a common sense, widely understood meaning: the killer conceals himself and waits for an opportune moment to act, such that he takes his victim by surprise. *See generally Webster's Third New International Dictionary* 67 (1976) (defining "ambush" as "the act of lying in wait in or of attacking by surprise from a concealed position"); *see also People v. Edwards*, 54 Cal.3d 787, 1 Cal.Rptr.2d 696, 819 P.2d 436, 457 (Cal.1991) (quoting jury instructions defining "lying in wait" as "a waiting and watching the victim for an opportune time to act, together with the concealment by ambush or some other secret design to take the victim by surprise") (internal quotation marks omitted).

The phrase "lying in wait" and the term "ambush" have such commonly understood meanings that the trial court need not have expressly defined them. *See People v. Powell*, 716 P.2d 1096, 1100 (Colo.1986) (concluding that there is no reason to provide the jury with definitions of commonly used words); *City of Aurora v. Woolman*, 165 Colo. 377, 381, 439 P.2d 364, 366 (1968) ("We cannot deal with pinpoint definitions of every word contained in instructions. Upon review, instructions must be read to convey normal meanings to juries in the context of the case in which they are given.").

---

24. § 16–11–103(5)(f). The trial court submitted this aggravator to the jury as follows: "the defendant committed the offense by lying in wait or from ambush."

25. Other than Dunlap's general objection "to each and every one of the instructions, every word of the instructions," the record does not indicate that Dunlap raised a specific objection to the instruction regarding the subsection aggravator (5)(f) or that he proposed an instruction that *specifically defined* "lying in wait" or ambush.

26. Historically, legislatures have deemed murder committed by a defendant who was lying in wait as a type of first degree murder, thus indicating that such a defendant was more culpable than a defendant convicted of second degree murder. In *Schad v. Arizona*, 501 U.S. 624, 641–42 n. 8, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991), the Supreme Court noted that many jurisdictions based their murder statutes on the 1794 statute that Pennsylvania enacted to divide common law murder into two offenses. That statute provided:

> [A]ll murder which shall be perpetrated by means of poison, or by lying in wait, or by any

other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder in the second degree.

*Id.* (quoting 1794 Pa. Laws, ch. 1766, § 2). Indeed, the murder statute applicable in Colorado in 1895 provided:

> All murder which shall be perpetrated by means of poison, or lying in wait, torture, or by any kind of wilful, deliberate and premeditated killing; ... or perpetrated from a deliberate and premeditated design, unlawfully and maliciously, to effect the death of any human being other than him who is killed; or perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder of the first degree, and all other kinds of murder shall be deemed murder of the second degree.

*Key v. People*, 715 P.2d 319, 322 n. 4 (Colo.1986) (quoting 1 Mills' Ann. Statutes, sec. 1176).

In light of the deferential nature of our vagueness review and because "lying in wait" and "ambush" are terms that an average juror should be capable of understanding, we conclude that the subsection (5)(f) aggravator is not unconstitutionally vague.

### C. Insufficient Evidence that Dunlap Killed to Prevent Arrest

Dunlap next claims that the prosecution did not present evidence sufficient to prove that he killed to prevent arrest, and that therefore the aggravator codified in section 16–11–103(5)(k) should not have been submitted to the jury.[27] We disagree.

The standard for determining the sufficiency of the evidence "is whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973), *quoted in People v. Thompson*, 748 P.2d 793, 794 n. 2 (Colo.1988). Although in *Bennett* we announced this standard in the context of a motion for a judgment of acquittal, we see no reason not to apply this standard to the sufficiency of evidence regarding an aggravating factor in the penalty phase of a capital murder case.[28]

In attempting to prove the subsection (5)(k) aggravator, the prosecution presented a theory based on evidence of circumstances involved in Dunlap's prior crimes. Specifically, the People purported to have identified a pattern of Dunlap's conduct that suggested

that he intended to leave no witnesses to his crimes at Chuck E Cheese's: Dunlap did not wear a mask during the commission of his first three robberies, and he was identified and apprehended. The People contend that Dunlap learned from these experiences that wearing a disguise would decrease his chances of being recognized by witnesses, so that in a second string of robberies he wore a mask to hide his identity. Dunlap did not wear a mask to protect his identity during the Chuck E Cheese's robbery, and therefore, the People argued, he intended to kill any witnesses to his crime. In addition, the People provided evidence that Dunlap shot Marge Kohlberg a second time because he believed that she had survived his first shot. The prosecution also presented testimony suggesting that Dunlap said he killed Colleen O'Connor because he "had to" despite the fact that she had told him she "wouldn't tell" on him.

In refuting the sufficiency of this evidence, Dunlap points out that he did not kill all of the victims of the robbery. He asserts that the evidence suggests that he knew Bobby Stephens had survived the gunshot wound. Hence, Dunlap argues that the prosecution's theory that Dunlap wanted to kill all possible witnesses is unsupported.

We conclude that the evidence presented by the People was sufficient to sustain a conclusion by a reasonable juror that Dunlap killed his victims in order to prevent apprehension. We decline to accept the notion that the fact that a defendant committed a robbery and a murder should by itself establish that the killing was neces-

---

**27.** Section 16–11–103(5)(k) provides that an aggravating factor exists when "[t]he class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody. This factor shall include the intentional killing of a witness to a criminal offense."

**28.** In reaching this conclusion, we are guided by the United States Supreme Court's decision in *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992). In that case, the Supreme Court concluded in the context of federal habeas corpus proceedings that a state court's application of a death penalty aggravator should be reviewed under the "rational factfinder" stan-

dard applied to determine the sufficiency of the evidence supporting a criminal conviction. *See id.* at 47, 113 S.Ct. 528. Under that standard, the issue to be determined upon review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard is substantially similar to the one we announced in *Bennett*, and we adopt the Supreme Court's position that such a standard applies to determine the sufficiency of the evidence of death penalty aggravators as well as criminal convictions.

sarily an effort to prevent arrest. *See Grubbs v. Delo*, 948 F.2d 1459, 1469–70 (8th Cir.1991). However, depending upon the circumstances of a particular case, the fact that a robber killed his victim, coupled with some additional evidence, may be sufficient to convince a juror beyond a reasonable doubt that the robber killed his victim to prevent arrest. In this case, that additional evidence was the fact that Dunlap did not wear a mask during the course of the Chuck E Cheese's robbery although he had done so for other robberies.[29] A reasonable juror could have found that the evidence supported a conclusion that Dunlap killed to prevent arrest. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781 (noting that the question in determining the sufficiency of the evidence is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

■ The fact that Dunlap may have had other motives does not preclude application of the aggravator addressing his alleged purpose of killing in order to prevent arrest or prosecution. As Dunlap contends, the evidence supports several additional motives for the murders: revenge for having been fired from Chuck E Cheese's, feelings of racial discrimination, the desire to see if he could "get away with it," and finally, that he was just "doing business." However, we do not read our statute to preclude the application of the subsection (5)(k) aggravator simply because Dunlap also may have acted for some of the above-stated reasons. Indeed, the statutory scheme indicates that multiple motives would not prevent application of such an aggravator because the scheme provides that a prosecutor can submit aggravators alleging both that a defendant committed a murder for pecuniary gain and for the purpose of avoiding or preventing a lawful arrest or prosecution. *See* § 16–11–103(5)(h), (k). Thus, as long as the prosecution presents evidence that preventing arrest was a partial motive of the defendant's murders, submission of the subsection (5)(k) aggravator is not error.

In sum, we conclude that Dunlap's challenge to the killing to prevent arrest aggravator fails. First, we hold that the prosecution presented evidence sufficient to convince the jury beyond a reasonable doubt that Dunlap killed his victims because they were potential witnesses whose identification of Dunlap could lead to his arrest. Second, we conclude that the fact that Dunlap may have had motives for the murders in addition to avoiding arrest does not prevent the application of the subsection (5)(k) aggravator.

### D. Conviction for Burger King Robbery as Basis for Aggravator

In January 1996, after Dunlap had been arrested for the murders at Chuck E Cheese's but before his trial had begun, Dunlap was convicted in a separate action of a November 1993 robbery and kidnapping at a Burger King restaurant. This conviction was the basis for the prosecution's submission to the jury of the subsection (5)(b) aggravator, which provides in pertinent part that an aggravating factor exists when "[t]he defendant was previously convicted in this state of a class one or two felony involving violence as specified in section 16–11–309." § 16–11–103(5)(b).

■ Dunlap claims that the Burger King conviction was "manufactured" for use as an aggravating factor, and that the use of the conviction as an aggravator should have been barred on due process or cruel and unusual punishment grounds because "the conviction was obtained as a direct result of intentional prosecutorial misconduct." Dunlap contends that the prosecution engaged in misconduct because it did not disclose its decision to seek the death penalty until more than a year after it had made the decision, and because the prosecution perpetrated discovery violations by not timely disclosing to the defense information it had regarding the Burger King robbery.

We first conclude that Dunlap's complaint that the prosecution withheld its decision to seek the death penalty in order to put him at

---

**29.** Indeed, the mere fact that Dunlap had worked at Chuck E Cheese's could have led a reasonable juror to conclude that Dunlap killed his victims

to prevent them from identifying him as a result of his status as a former employee.

a disadvantage is without merit. Dunlap's argument seems to be that the prosecution withheld its decision to seek the death penalty so that Dunlap would be forced to ask for a continuance, which would permit the People to try the Burger King case prior to the Chuck E Cheese's trial, and would therefore allow the People to obtain a prior conviction to use as an aggravator in the capital case.

Dunlap is correct that one of the prosecutors stated that he formed a personal opinion that the Chuck E Cheese's case could potentially warrant capital punishment on the day after the murders, in December 1993. However, the same prosecutor stated that the People reached an official decision to seek the death penalty in January 1995, only a few days before they filed the decision with the court and made it public.

Even if we were to accept Dunlap's contention that the prosecution delayed its announcement regarding the death penalty, we are not persuaded that Dunlap was prejudiced as a result. The People announced their decision in January 1995, more than a year before the trial began. Thus, Dunlap had sufficient time to prepare or alter his strategy in response to the prosecution's decision. *See People v. District Court*, 825 P.2d 1000, 1003 (Colo.1992) (finding adequate notice when the People announced their intent to seek the death penalty forty-one days prior to trial).[30]

In Dunlap's second allegation of prosecutorial misconduct regarding the Burger King case, he notes that the prosecution committed a discovery violation by failing to timely disclose information it had uncovered in the course of investigating the Burger King robbery.[31] To remedy this discovery violation, the trial court ordered the People to provide a written plan describing how the prosecu-

tion would turn over discoverable materials and ordered a continuance to allow the defense to prepare for the effect of the Burger King case on Dunlap's capital trial. Dunlap argues that this continuance did not serve as a sanction for the prosecution, but rather served to aid the prosecution's attempt to have the Burger King case tried before the Chuck E Cheese's case. Thus, Dunlap claims that the trial court abused its discretion by not applying a more appropriate remedy, such as prohibiting the prosecution from using any conviction obtained in the Burger King case as a statutory aggravator in the Chuck E Cheese's case.

We reject Dunlap's contention that a continuance was not an appropriate remedy. Dunlap is correct that the continuance may have had the effect of facilitating the prosecution's effort to try the Burger King case before the Chuck E Cheese's trial, and that the continuance thus may have benefited the prosecution to some extent. What Dunlap fails to point out, however, is that his own motion for a continuance was pending when the court decided on the discovery sanctions. Indeed, during the hearing regarding the discovery violations, Dunlap repeatedly complained that the prosecution was trying to rush him to trial, and he asked the court to grant the pending motion for a continuance as part of the discovery sanction.

In deciding upon the correct sanction to impose for the prosecution's discovery violations, the trial court acted in accordance with our decision in *People v. District Court*, which requires that a trial court " 'impose the least severe sanction that will ensure that there is full compliance with the court's discovery orders.' " *People v. District Court*, 808 P.2d 831, 836–37 (Colo.1991) (quoting *People v. District Court*, 793 P.2d 163, 168

---

30. In *People v. District Court*, we noted that our death penalty statute does not mandate that the prosecutor give notice of intent to seek the death penalty, but we acknowledged that due process requires notice adequate to ensure that the defendant is not denied the benefit of the adversarial process. *See People v. District Court*, 825 P.2d at 1002–03.

31. The People argue that contrary to the trial court's finding, the prosecution did not commit a discovery violation with regard to the informa-

tion pertaining to the Burger King case. The prosecution notes that it disclosed the relevant information to Dunlap in December 1994, before it charged Dunlap with the Burger King crimes. The prosecution further argues that because it had no duty under Crim. P. 16(I)(b)(1) to provide Dunlap with that information until after it had charged him with the offenses, it did not commit a discovery violation.

We do not address this contention here.

(Colo.1990)). The court looked at the factors we set out to guide a trial court's formulation of a sanction,[32] and decided that in this case a continuance was sufficient to cure any prejudice and "restore as nearly as possible the level playing field that existed before the discovery violation." *People v. District Court,* 808 P.2d at 837.

We conclude that the trial court acted within its discretion in ordering a continuance and requiring the prosecution to submit a discovery schedule to the court. *See Castro,* 854 P.2d at 1265 ("Rule 16 gives trial courts broad discretion in fashioning remedies for violations of its provisions."). Any prejudice the defense may have suffered as a result of delayed notice of the People's intention to prosecute Dunlap's involvement in the Burger King robbery was cured by the continuance, and prohibiting the People from using the Burger King conviction would have resulted "in an unwarranted windfall for the defendant[ ]." *People v. District Court,* 793 P.2d at 168 (holding that a continuance would cure any prejudice suffered because of withheld discovery where the prosecutor did not act in bad faith and eventually disclosed the relevant information before trial). We therefore find no error in the submission of the subsection (5)(b) aggravator to the jury.

## VII. Polygraph Evidence

■ Dunlap next contends that he was unconstitutionally deprived of the opportunity to submit polygraph evidence in order to impeach the testimony of a prosecution witness, Joshua Carl Wilson. Because such evidence is per se inadmissible under Colorado evidentiary law, we hold that the trial court did not commit a constitutional error or abuse its discretion by refusing to allow Dunlap to introduce the evidence.

### A. Factual Background

Carl Wilson was Dunlap's friend of two years and his accomplice in several crimes prior to the Chuck E Cheese's homicides. In exchange for a favorable plea bargain, Wilson agreed to testify truthfully against Dunlap in Dunlap's Burger King aggravated robbery case and in this case.

However, Wilson twice changed his statements concerning the Chuck E Cheese's offenses after police told him that he had failed polygraph tests. Despite this fact, the People called Wilson to testify in the guilt and sentencing phases of this case. Wilson testified in the guilt phase only with respect to the Chuck E Cheese's offenses. At that time, Dunlap asked the court to allow him to introduce the polygraph evidence to impeach Wilson, but the court denied Dunlap's request.

Subsequently, in the sentencing phase, Wilson testified regarding other crimes that Dunlap had committed, including the attempted shooting of a rival, an incident in which Dunlap and his friends got into a fight with a gang at a party, Dunlap's robbery of a dry cleaner with a golf club, their joint robbery of a pizzeria with handguns, and Dunlap's aggravated robbery of another restaurant.

Dunlap argues that the trial court's ruling deprived him of the opportunity to impeach Wilson's testimony. As such, Dunlap contends that he was deprived of relevant mitigation evidence and thus subjected to an arbitrary and capricious imposition of death.

### B. Constitutionality of the Per Se Rule

■ In *People v. Anderson,* 637 P.2d 354, 361 (Colo.1981), this court held that evidence of polygraph results and testimony of polygraph examiners is per se inadmissible in a criminal trial. The defendant in *Anderson* successfully passed a polygraph exam in which he denied committing the crimes charged against him. We held that the "use of the polygraph at trial interferes with and may easily prejudice a jury's evaluation of the demeanor and credibility of witnesses and their testimony." *Id.* at 358. We specifically noted a multitude of factors other than

---

32. *See People v. Castro,* 854 P.2d 1262, 1265 (Colo.1993) (stating that in formulating a sanction, a trial court "should take into account the reason why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances") (quoting *People v. District Court,* 793 P.2d at 167).

truthfulness that may affect polygraph results:

> emotional upset of the subject, his fatigue, drunkenness, subjection to drugs, bad physical or emotional condition, high blood pressure, hardening of the arteries, obesity, feeblemindedness, amnesia, psychotic condition, being a pathological liar, having lack of fear or lack of concern of being caught in a lie, surreptitious nervous stimulation, use of antiperspirant, hypnosis, or the presence of extraneous noise or abnormal temperature at the test locale.

*Id.* at 359 (quoting *People v. Adams,* 53 Cal.App.3d 109, 125 Cal.Rptr. 518 (1975)) (original emphasis deleted). Beyond the potential for serious error that polygraph evidence creates, we held that:

> The admission of polygraph evidence at trial is … unwarranted because of the serious interference with and potential prejudice to a jury's evaluation of the demeanor and credibility of witnesses and their testimony. In reaching our decision, we are acutely aware that the polygraph is unlike other scientific evidence, since what it attempts to measure-the truthfulness of a witness or defendant-is so directly related to the essence of the trial process.

*Id.* at 361.

Dunlap offered no proof of the current reliability of polygraph evidence at trial, and makes no such argument now; hence, we find no reason to reconsider our holding in *Anderson.* It is, then, the law of this state that polygraph evidence is per se inadmissible in a criminal trial. Therefore, we find that Dunlap's right to present all *relevant* mitigating evidence under *Lockett,* 438 U.S. at 598, 98 S.Ct. 2954, does not include the right to present evidence concerning polygraph results.

We find support for this holding in a recent United States Supreme Court decision rejecting a defendant's constitutional challenge to a per se rule against the admission of polygraph evidence. *See United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998) (holding that a per se rule against admission of polygraph evidence did not violate the defendant's right to present a defense under the Fifth and Sixth Amendments). The Court in *Scheffer* noted that "[t]o this day, the scientific community remains extremely polarized about the reliability of polygraph techniques." *Scheffer,* 118 S.Ct. at 1265.

*Scheffer* was consistent with the Court's holding three years earlier in *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995). In *Bartholomew,* the Court held that a state's failure to disclose the fact that a prosecution witness had failed a polygraph test did not deprive the defendant of "material" evidence under the rule in *Brady v. Maryland. See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that Fourteenth Amendment Due Process requires the prosecution to disclose to the defendant all material evidence relevant to guilt or punishment). The Court explained that there was no reasonable likelihood that the prosecution's disclosure of polygraph evidence would have affected the outcome of the trial, because such evidence was per se inadmissible under Washington State law:

> The information at issue here, then——the results of a polygraph examination of one of the witnesses——is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses.

*Bartholomew,* 516 U.S. at 5, 116 S.Ct. 7; *see also Castillo v. Johnson,* 141 F.3d 218, 221 (5th Cir.) (holding that the prosecution did not violate the defendant's constitutional right to due process or to present a defense in a capital murder case by withholding polygraph evidence that was per se inadmissible under Texas law), *cert. denied,* —— U.S. ——, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998).

▆ These Supreme Court cases indicate that a state may adopt a per se rule excluding polygraph evidence from criminal trials without implicating federal constitutional concerns. The courts of other states have had the occasion to test this concept in the context of death penalty proceedings, and have determined that excluding polygraph

evidence does not result in error. *See, e.g., State v. Hall,* 955 S.W.2d 198, 207 (Mo.1997) (holding that the trial court properly excluded evidence during the capital sentencing phase that the defendant denied involvement in the crime without failing a polygraph test), *cert. denied,* — U.S. —, 118 S.Ct. 1375, 140 L.Ed.2d 523 (1998); *Downs v. State,* 572 So.2d 895, 900 (Fla.1990) (holding that the trial court did not abuse its discretion by excluding evidence showing that defendant's co-conspirator, whose testimony formed the primary basis of the state's death penalty case, had difficulty passing a polygraph test).

Hence, we hold that the trial court did not abuse its discretion or violate Dunlap's constitutional rights by rejecting Dunlap's request to admit polygraph evidence. We further note that the trial court did allow Dunlap to question Wilson about his motive to curry favor and about the fact that when the police accused him of lying, he changed his statement. Thus, Dunlap was afforded sufficient opportunity to impeach Wilson's credibility.

## VIII. Prosecutorial Misconduct

Dunlap alleges several instances of prosecutorial misconduct in both the guilt and penalty phases of his trial, the cumulative effect of which violated his rights to due process of law,[33] to a fair trial,[34] and to protection from cruel and unusual punishment.[35] First, Dunlap alleges that during the guilt phase of the trial, the People engaged in misconduct in that they elicited prejudicial comments from jurors during voir dire and used remarks in the opening statement that evoked juror bias.[36] Second, Dunlap claims that the People made several improper comments during the closing argument in the guilt phase of the trial.

### A. Guilt Phase

■ Dunlap challenges the fact that the People questioned potential jurors in open court regarding their beliefs about the death penalty. Prior to jury selection, the People confessed Dunlap's motion for individually sequestered voir dire regarding death qualification issues.[37] Subsequently, such individual questioning took place in camera, during which the court engaged in the death qualification process. After the in camera voir dire, however, a potential juror stated in open court that he had just decided that in fact he could not vote to impose the death penalty. The juror made his remark in the context of questioning regarding the general ability of the venire members to take part in the deliberative process. In response to that remark, the prosecution asked follow-up

**33.** U.S. Const. amend. XIV, § 1; Colo. Const. art. 2, § 25.

**34.** U.S. Const. amend. VI; Colo. Const. art. 2, §§ 16, 23.

**35.** U.S. Const. amend. VIII; Colo. Const. art. 2, § 20.

**36.** Dunlap makes two other allegations of prosecutorial misconduct that are precluded by our holdings on other issues in this opinion. First, he argues that the People's presentation of evidence in rebuttal of statutory mitigators he had not raised in his defense constituted prosecutorial misconduct. Because we conclude that the rebuttal mitigation evidence that Dunlap challenges is ultimately admissible under section 16–11–103(1)(b) for purposes of *Tenneson* step four, we reject his contention.

Second, he claims that the People presented unnecessary and cumulative evidence that served only to inflame the passions of the jury. However, we conclude that the admission of the evidence about which Dunlap complains, photographs and testimony regarding his murder vic-

tims, did not violate the Colorado Rules of Evidence. *See* discussion Part V.B. & C. *supra.* We therefore reject Dunlap's allegation that the presentation of this evidence constituted prosecutorial misconduct.

**37.** "Death qualification" refers to a juror's ability to impose the death penalty according to the jury instructions if he feels it is warranted. *See generally People v. O'Neill,* 803 P.2d 164, 170 (Colo. 1990) ("Because it is for the jury to determine whether death is an appropriate sentence, it is equally appropriate to question potential jurors on their beliefs concerning the death penalty."). A juror may be excused because of his opinions regarding capital punishment "if the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (footnote and internal quotation marks omitted); *see also Davis,* 794 P.2d at 204 (holding that the *Witt* standard regarding the exclusion of jurors because of their views on the death penalty is the governing standard in Colorado).

questions regarding that potential juror's death penalty views, and invited other members of the venire to express any second thoughts regarding the punishment of death. After several potential jurors voiced their opinions, Dunlap objected and moved for a mistrial. The court denied the motion.

■■■■ Dunlap alleges that because the People confessed his motion and agreed to in camera voir dire on death-qualification issues, the law of the case required that such questioning occur only in chambers.[38] In this context, the doctrine of the law of the case refers to "the binding force of trial court rulings during later trial court proceedings." *People v. Roybal,* 672 P.2d 1003, 1005 n. 5 (Colo.1983). The doctrine provides that prior relevant rulings made in the same case are to be followed unless such application would result in error or unless the ruling is no longer sound due to changed conditions. *See People ex rel. Gallagher v. District Court,* 666 P.2d 550, 553 (Colo.1983). When applied to a court's power to reconsider its own prior rulings, we have characterized the law of the case as a "discretionary rule of practice." *Id.* (quoting *United States v. United States Smelting Refining & Mining Co.,* 339 U.S. 186, 199, 70 S.Ct. 537, 94 L.Ed. 750 (1950)).

■■■■ We conclude that the open-court questioning did not violate the doctrine of the law of the case. We first note that the discussion about death qualification was re-initiated by a member of the venire after the individual voir dire had concluded. The prosecution did not raise the issue in an intentional effort to disregard the agreed-upon procedure of discussing such matters in camera. Second, regardless of who initiated the discussion, the trial court had discretion to allow the questioning if it felt that the issue had not been sufficiently resolved during the in camera voir dire. Third, Dunlap did not object to the questioning until several jurors had raised concerns, at which point the trial court stopped the questioning and suggested that some of the venire members should be reexamined in camera. In denying Dunlap's motion for a mistrial, the trial court

acted within its discretion to adjust its rulings to the circumstances.

Dunlap's other allegation of prosecutorial misconduct during the guilt phase of the trial relates to a remark the People made during their opening statement. At the end of his opening statement, the prosecutor said: "In the name of those who perished at Chuck E Cheese, we will ask you to hold the defendant accountable for these most vicious crimes by finding him guilty as charged." Dunlap alleges that this was an impermissible remark because it was calculated to evoke bias or prejudice in the jury.

■■■■ We have held that it is impermissible for a prosecutor to use arguments calculated to inflame the passions or prejudice of the jury. *See People v. Oliver,* 745 P.2d 222, 228 (Colo.1987). The prohibition against such remarks prevents a prosecutor from appealing to the "jury's predisposition against some particular segment of society." *See* ABA *Standards for Criminal Justice, Prosecution Function and Defense Function* § 3–5.8 commentary at 108 (3d ed.1993), *cited in Harris v. People,* 888 P.2d 259, 265 (Colo.1995). Thus, we have characterized as improper arguments that tend to influence jurors to issue a verdict based on preexisting biases rather than on facts in evidence and inferences drawn from those facts. *See Harris,* 888 P.2d at 265–66 (finding inappropriate an argument made on the first day of the Persian Gulf War that repeatedly compared the defendant to Iraqi leader Saddam Hussein); *Oliver,* 745 P.2d at 228 (holding that the prosecutor made an improper argument in commenting on the defendant's association with an individual whom the prosecution asserted was homosexual). Moreover, we have recognized that "golden rule" arguments, which ask jurors to imagine themselves in the place of the victim, are improper in criminal cases in contexts other than capital sentencing. *See Rodriguez,* 794 P.2d at 973. Like remarks aimed at jurors' biases, golden rule arguments in the guilt phase of a criminal trial are impermissible digressions from the evidence. *See* ABA *Standards,* § 3–5.8

---

**38.** Dunlap concedes that he had no constitutional right to in camera voir dire, and bases his argument on the notion that the prosecution and the trial court did not adhere to the court's previous ruling on in camera voir dire for death-qualification issues.

commentary at 109 ("The prosecutor should not make arguments that encourage the jury to depart from its duty to decide the case on the evidence and the inferences reasonably derived therefrom.").

■ We have allowed a prosecutor to argue, in a capital sentencing proceeding, that the jurors should assess the crime from the standpoint of the victim. *See Rodriguez*, 794 P.2d at 974. However, here we agree with Dunlap that it was inappropriate for the prosecution to ask the jury in the guilt phase to return guilty verdicts "[i]n the name of those who perished at Chuck E Cheese." Indeed, the prosecutor was encouraging the jury to depart from its duty to decide the case on the evidence, and was asking the jury to memorialize or pay tribute to the victims by its verdict. By invoking the victims almost in the fashion of a prayer, the prosecutor exceeded proper bounds of argument.

■ Dunlap objected to the prosecutor's improper comment at trial.[39] We thus consider the error under a harmless error analysis, and the error requires reversal unless we conclude that it was "harmless beyond a reasonable doubt." *Key*, 865 P.2d at 827 (quoting *Leonardo*, 728 P.2d at 1257). In making our determination, we must consider whether, in light of the entire record, " 'there is a reasonable possibility that the defendant could have been prejudiced' " by the error. *See People v. Rodgers*, 756 P.2d 980, 984 (Colo.1988) (quoting *Leonardo*, 728 P.2d at 1257).

■ In the guilt phase of this trial, Dunlap proceeded upon a theory of mistaken identification. The prosecution, however, presented a litany of witnesses and exhibits that overwhelmingly demonstrated Dunlap's guilt. Bobby Stephens testified that he was "100 percent positive" that Dunlap was the person who had shot him at Chuck E Cheese's. Carl Wilson testified that Dunlap came to his house on the night of December 14, 1993 and said "I did it.... Chuck E Cheese." Wilson also stated that Dunlap was carrying a bag full of cash and checks

and that Dunlap had explained how he hid in the bathroom at Chuck E Cheese's until it closed and then proceeded to shoot five people in the course of robbing the restaurant. Tracie Lechman testified that Dunlap arrived at her house at approximately 11:00 p.m. on the night of the murders with bundles of money in his pockets. She recounted that she overheard him on the telephone asking someone whether peroxide removed gunshot residue and stated that Dunlap told her that some people had been shot at Chuck E Cheese's that night.

After considering the staggering evidence of guilt in the record, we conclude that there was no reasonable possibility that the defendant could have been prejudiced by the prosecutor's improper remark. Considered in isolation, a golden rule argument has the potential to incite jurors to reach a verdict on the basis of bias or prejudice. *See ABA Standards*, § 3–5.8 commentary at 109. However, the nature and quantity of the People's evidence in this case preclude any reasonable possibility that the improper comment diverted the jury's attention away from the evidence and caused it to arrive at a different verdict than it would have reached absent the improper argument. *See Rodriguez*, 914 P.2d at 278 (concluding that the prosecutor's improper remarks did not constitute reversible error because the evidence at trial "was sufficient in both quality and quantity to support the conclusion that the jury could not have arrived at a verdict other than guilty") (quoting *Rodgers*, 756 P.2d at 985).

We therefore reject Dunlap's allegation of reversible error during the People's opening statement at the guilt phase of the trial.

### B. Penalty Phase

Dunlap also alleges several instances of misconduct by the People during the closing argument at the penalty phase of trial. We address each allegation of improper argument in turn, after which we address wheth-

---

**39.** Because the comment invoking the names of Dunlap's victims was the final remark in the People's opening statement, Dunlap did not object contemporaneously. He did, however, move for a mistrial based on the impropriety of that comment as soon as the court excused the jury. We therefore address the allegation of error as though Dunlap had objected contemporaneously.

er the cumulative effect of any misconduct we find to have occurred warrants reversal of Dunlap's death sentence. Because Dunlap objected at trial to the remarks he challenges,[40] we will review the allegations of error under the harmless error standard, and any error will require reversal unless we are convinced that the error was harmless beyond a reasonable doubt. *See Key,* 865 P.2d at 827; *see also Rodriguez,* 914 P.2d at 278.

Dunlap first complains that the prosecutors improperly expressed their personal belief that Dunlap deserved the death penalty.[41] Because the prosecutors did not make arguments based upon their personal opinions or superior knowledge, however, we reject this argument.

■ A prosecutor may not assert her personal opinion regarding the guilt of the defendant or the veracity of the witnesses. *See, e.g., Wilson v. People,* 743 P.2d 415, 418 (Colo.1987); *People v. Plotner,* 188 Colo. 297, 302, 534 P.2d 791, 794, (1975). It is unfairly prejudicial, for example, for a prosecutor to tell a jury that a defendant's crime is the worst out of all the cases that she has tried. *See Rodriguez,* 794 P.2d at 978.

■ Whereas a prosecutor may not interpose her own opinion, she may properly argue "for or against a sentence of death" based on the evidence. *Id.* at 975 (quoting § 16–11–103(1)(b), 8A C.R.S. (1986)). In the

penalty phase of a capital trial, the jury is required to make a factual and moral assessment of whether death is the appropriate penalty. *See Tenneson,* 788 P.2d at 791. Thus, in arguing to the jury during the penalty phase that a defendant should in fact receive the death penalty, a prosecutor may endeavor to separate him from other defendants eligible for the death penalty.[42] As long as any argument to that effect is supported by the evidence, and is not merely an expression of the prosecutor's personal opinion, the argument is permissible.

■ Here, the prosecutor based the challenged arguments for the application of the death penalty at least in part on the testimony of a police officer who remarked that in his eighteen years with the police department, "This by far, by magnitude, is the biggest thing that I have ever seen and probably will ever see again" in terms of the need for investigation assistance. The prosecutor was arguing that the gravity of Dunlap's crime distinguished it factually and morally from other murders to such an extent that death was the appropriate penalty. We find no error in these comments.

Second, Dunlap argues that the prosecution improperly appealed to the passions and prejudices of the jury by referring to Dunlap's "Crazy Horse" tattoo;[43] by playing to the jury's sympathy for the victims of Dun-

---

**40.** Prior to the People's closing, Dunlap requested a continuing objection to every word of the prosecution's anticipated argument. The trial court granted this objection to prevent the closing from "[turning] into a constant objection battle," although it warned that the continuing objection was "not a basis by which counsel may simply sit back and watch the world go by and never say anything if they're really concerned about something." Although we do not embrace this format for making objections, *see supra* note 15, we will proceed as though Dunlap made contemporaneous objections to the challenged remarks for purposes of reviewing the alleged misconduct. We therefore apply the standard that any error must be harmless beyond a reasonable doubt in order for reversal not to be warranted. *See Rodriguez,* 914 P.2d at 278 n. 50 (electing to apply the "harmless beyond a reasonable doubt" standard to allegations of error because of fairness considerations, despite the fact that the defendant did not contemporaneously object to all of the challenged arguments).

**41.** Specifically, Dunlap challenges the following remarks: (1) in commenting upon Dunlap's prior crimes, the People stated, "It's hard to believe that a person can be that bad, that evil. The death penalty isn't for everyone."; (2) the prosecution paraphrased the testimony of a policeman who said he had never seen anything like the Chuck E Cheese's murder scene in all of his years as a policeman, and then remarked, "There's only one Chuck E Cheese ...."; and (3) in asking the jury to return death verdicts, the People queried, "We ask you because if not now, when? If not this, what? If not him, who?".

**42.** For a discussion of the eligibility and selection of criminal defendants for the death penalty, *see* part II.A. *supra.*

**43.** The People remarked, "Crazy Horse as a moniker for Nathan Dunlap seems to fit, because he wears that today. Roll up his left sleeve and you'll see it today as boldly and as clearly as if he was waving those four scalps from his hand."

lap's prior crimes by detailing the circumstances of those crimes; and by graphically describing the Chuck E Cheese's murders.[44]

■ We disapprove of the prosecution's remarks comparing Dunlap to Crazy Horse and painting the image of Dunlap waving the scalps of his victims in his hands. The People's use of the "Crazy Horse" tattoo for purposes other than the identification of Dunlap as the author of the threatening letters was a highly inappropriate appeal to passion and prejudice. Crazy Horse was the Sioux Chief and warrior who conquered General Custer at Little Big Horn. Although vilified by some, to many, Crazy Horse is a Native American hero who represents the last resistance to the near eradication of the Native American population. Thus, the prosecution's remarks represented an inflammatory and biased characterization of Crazy Horse.

Although the "Crazy Horse" tattoo was properly admitted into evidence for the purpose of identifying Dunlap and the jury was free to draw its own conclusions in that regard, the People's depiction of the image of Dunlap waving scalps was an impermissibly "impassioned expression of anger." *See Harris*, 888 P.2d at 266 (holding improper prosecutorial remarks that encouraged the jury to compare the defendant and his conduct to personalities and conduct irrelevant to the defendant's case). Unlike the remarks in *Harris*, however, these improper remarks were not so egregious as to warrant reversal.

In *Harris*, the defendant challenged an argument, made on the day the Gulf War started, in which the prosecution compared the defendant to Saddam Hussein. We concluded that in light of the prosecution's repeated irrelevant references to Saddam Hussein during a period of intense national awareness of the crisis involving Iraq, such comments substantially prejudiced the jury. We further noted that our conclusion was compelled by the "conflicting and inconclusive nature of the evidence presented at trial." *Id.* at 268. Here, however, the prosecu-

tion's comparison of Dunlap to Crazy Horse was not repeated, nor did the prosecution direct its comment toward inciting the jurors to act upon a common and current heightened sensitivity. Moreover, the evidence regarding Dunlap's legal responsibility for the crime was not in conflict to the same extent as was Harris's. Accordingly, we find that the Crazy Horse reference, although improper, was harmless beyond a reasonable doubt when viewed in the context of the entire record. *See Rodgers*, 756 P.2d at 984 (noting that when determining whether an error was harmless beyond a reasonable doubt, a reviewing court must examine the remarks in the context of the entire record).

■ The argument that the prosecution made regarding Dunlap's prior crimes related to the testimony in evidence describing those crimes. *See Rodriguez*, 794 P.2d at 975 ("A prosecutor may argue the facts in evidence and reasonable inferences from those facts."); *see also* Part III. *supra* (discussing the admissibility of facts regarding Dunlap's prior crimes). Likewise, the People's description of the manner in which Dunlap killed his victims did not constitute misconduct. The prosecutor was merely describing what the evidence had shown. *See Rodriguez*, 794 P.2d at 974 (holding that in order for the jury to make a determination as to whether death is the appropriate penalty, "it is proper for the jury to consider the circumstances of the offense itself"); *see also Payne*, 501 U.S. at 832, 111 S.Ct. 2597 (stating that a prosecutor's comments in closing about the defendant's victims, one of whom had been stabbed forty-one times and bled to death, did not violate the Constitution) (O'Connor, J., concurring).

The fact that the manner in which the homicides were committed evokes sympathy for the victims or disgust at the brutality of the killings is inherent in the crime itself. It is not a result of any wrongdoing on the part of the prosecution. *See id.* at 825, 111 S.Ct. 2597 (noting that a state may properly conclude that in order for a jury to assess a

---

**44.** In describing how Dunlap committed the murders, the People stated: (1)"Snuck up behind this girl. Shattered her brain with a bullet."; and (2) "That was the last thing he ever saw is

that bullet getting into that eye that he was trying to see what happened before it crashed into his brain."

defendant's blameworthiness and culpability for purposes of deciding upon the death penalty, it should have before it evidence regarding the specific harm caused by the defendant).

Dunlap's third allegation of misconduct during the People's closing is that the prosecution improperly misled the jury about the conditions of Dunlap's confinement. Dunlap asserts that the prosecution presented no evidence of prison conditions at trial and therefore acted improperly when it argued that Dunlap would enjoy a relatively favorable environment if sentenced to life in prison rather than to death.[45] Dunlap also complains that the prosecution improperly commented upon the potential for Dunlap to engage in further criminal activity if he were to be incarcerated.[46]

We addressed substantially similar arguments in *Rodriguez*. There, we held that it was not error to argue about the safety of prisoners and guards at the prison at which the defendant would be confined if not sentenced to death. We concluded that such an argument is "an appropriate means of pointing out the possibility of [the defendant's] future dangerousness and [does] not call for a speculative inquiry into prison conditions." *Rodriguez*, 794 P.2d at 976 (quoting *Tucker (William) v. Kemp*, 762 F.2d 1480, 1486 (11th Cir.1985) (en banc), *vacated*, 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *aff'd*, 802 F.2d 1293 (11th Cir.1986)) (citations omitted). We also held that it was not improper for a prosecutor to make an argument for the death penalty by comparing the defendant's ability while in jail to communicate with his friends and loved ones to the deceased victims' inability to do so. *See id.* at 975 (finding not objectionable an argument regarding the fact that unlike the defendant, his victim would never be able to write letters, socialize with friends, go to work, or watch television).

Applying our reasoning in *Rodriguez* to the comments Dunlap challenges here leads us to conclude that the prosecution's comments did not constitute misconduct. In remarking upon Dunlap's ability to maintain communications with loved ones while in prison, the People argued based upon inferences drawn from facts in evidence, such as the activities Dunlap was able to engage in while in jail awaiting trial.[47] In commenting upon his potential ability to exact further revenge while incarcerated, the prosecution made a permissible reference to Dunlap's future dangerousness. *See id.* at 976. Neither of these sets of remarks constituted misconduct.

Finally, Dunlap asserts that the prosecution diminished the jurors' individual responsibilities to decide upon the appropriate penalty and thus violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Dunlap challenges the fact that, in discussing the jurors' responsibilities during deliberations, the People stated that the jurors could "look to each other" while deciding whether to reach a conclusion of life or death.[48]

---

**45.** The People argued:

We learned a lot about jail, didn't we? Think about pain when his sister comes to visit him. They have telephones. Talks to his mom. Think about pain when he writes letters, not only to his family, but letters to his friends. Remember those threats?

Think about the pain as he develops friendships. Think about pain when we talked about the exercise drill. Think about pain as he's playing cards every day and while he's playing ping pong.

... These kids can only be visited where they're at now....

**46.** Specifically, Dunlap complains about the following statements:

Do you need to think about what this person, if given life, could do down the road if given life?
....

He can hold a grudge, he can threaten, he can retaliate, he can exact revenge. There is nothing that will prevent him, nothing that will stop him.
....

Maybe not today, maybe not tomorrow, maybe not next week or next month or next year, but Nathan will have his revenge.

**47.** *See Rodriguez*, 794 P.2d at 975. The record contains testimony regarding the fact that while incarcerated prior to trial, Dunlap could play cards and watch television with other inmates as well as maintain correspondence with friends and family.

**48.** The interchange involving the challenged remarks went as follows:

People: When you go into the jury room and you look at the instructions and you

In *Caldwell*, the Supreme Court determined that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328–29, 105 S.Ct. 2633. The Court reached this conclusion in the context of addressing the conduct of a prosecutor who argued to a jury that it did not ultimately determine the fate of the defendant because any sentence rendered would automatically be appealed to the state supreme court. *See id.* at 325, 105 S.Ct. 2633. Although we note that the *Caldwell* concern relates primarily to the potential for unreliability in sentences "when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an *appellate court*," *id.* at 330, 105 S.Ct. 2633 (emphasis added), we heed the Supreme Court's broad concern regarding the possibility that a prosecutor's comments could reduce an individual juror's general sense of responsibility.

We disapprove of the isolated statement that whether death is the appropriate penalty "is not a decision any one of you has to make all by yourself." Standing alone, such a statement would tend to conflict with the mandate that each individual juror decide whether death is the appropriate punishment, and might serve to lessen a juror's

> look at the evidence and you remember the victims and you remember what occurred, we ask that you look to each other, you look to each other for the strength and the courage to do the right thing in this case. We ask that you work together and deliberate together, 'cause this is not a decision any one of you has to make all by yourself, this is a decision—
>
> Dunlap: [objects]
> Court: Objection is overruled, but the Court directs that the jury specifically reread the instructions that I have given you and you are to rely on my statement of the law and no one else's.
> ....
> People: This is a decision that you have to make individually, because it's important to each one of you, just as it's important to society. But it's also a decision that you make collectively, and that's why I say look to each other for support and guidance. Look to each other to come up with

sense of importance regarding his or her individual contribution to the deliberative process. We agree with the trial court, however, that any confusion that statement may have caused was clarified by the judge's instruction immediately thereafter that the jury was to rely on the court's statement of the law, and by the People's corrected argument to the jurors that the decision was indeed one that each juror needed to make individually.[49] *See generally Davis*, 794 P.2d at 196 (finding no error where jury instructions alleged to have diminished the jury's sense of responsibility "could not possibly have detracted from the clear understanding of the jury" regarding its responsibility). We therefore reject Dunlap's allegation that the prosecution's closing argument served to diminish the jurors' sense of responsibility.

Thus we have reviewed all of Dunlap's allegations of error regarding the People's closing argument at the guilt phase, and although we have found some instances of misconduct, we conclude that these errors were harmless beyond a reasonable doubt. Accordingly, we reject Dunlap's assertion that the People's misconduct during its closing argument warrants reversal of the death sentence.[50]

Indeed, we find that none of Dunlap's contentions of error or misconduct warrant reversal.[51]

> the right verdict, because we are asking you to come up with a verdict that remembers the victims.

49. In denying Dunlap's motion for mistrial based on this allegation of error, the trial court ruled that whatever problem might have been caused by the statement "was immediately cured by [the prosecutor] who, as soon as I ruled and reminded the jury that they must follow the instructions on the law, ... promptly stated exactly what the law was, that each juror ... must make his or her own determination to the proper sentence in the case."

50. The defendant raises various other contentions of error. We find them to be without merit, and decline to address them with specificity.

51. The People make two assertions of error on cross-appeal: (1) that the trial court incorrectly ordered that the defendant's expert would be entitled to be present while the Colorado Bureau of Investigation tested bloodstain samples for the

### IX. Independent Review

Finally, our statute requires this court to review the propriety of any sentence to death, with "regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based." § 16–11–103(6)(a).Specifically, the court may not uphold a death sentence if the court determines that it was imposed "under the influence of passion or prejudice or any other arbitrary factor, or that the evidence presented does not support the finding of statutory aggravating circumstances." § 16–11–103(6)(b).

We here undertake the review mandated by the statute: first, with regard to the nature of the offense; second, with regard to the character and record of the offender; third, with regard to the public interest; and finally, with regard to the manner in which the sentence was imposed.

■ As to the nature of the offense, this was an offense that was planned, deliberate, and shocking. Dunlap was lying in wait before he attacked his victims. There were multiple victims, most of whom were quite young. The murders themselves were cold-blooded executions. The People presented evidence of six non-duplicative statutory aggravators. In support of the subsection (5)(b) aggravator regarding prior felony convictions, the People put on evidence of the Burger King robbery conviction, which involved kidnapping a robbery victim with the use of a deadly weapon. In support of the subsection (5)(f) aggravator regarding an offense committed while lying in wait, the People established that Dunlap hid in the bathroom prior to committing the Chuck E Cheese's murders. In support of the subsection (5)(g) aggravator regarding death caused in the course of or in furtherance of a class one, two, or three felony, the People put on evidence that Dunlap intentionally killed his victims during the course of committing a burglary. In support of the subsection (5)(h) aggravator regarding a class one felony committed for pecuniary gain, the People showed that Dunlap took money from the restaurant. In support of the subsection (5)(i) aggravator regarding creating a grave risk of death to another person in addition to the victim of the offense, the People demonstrated that in committing the murders, Dunlap created a grave risk of death to Bobby Stephens by shooting him in the head. Finally, in support of the subsection (5)(k) aggravator regarding the intentional killing of a witness to an offense, the People presented evidence suggesting that Dunlap did not wear a mask during the commission of the Chuck E Cheese's robbery because he planned to kill any witnesses to his crimes. Additional evidence on this factor included testimony that Dunlap killed Colleen O'Connor despite the fact that she begged for her life and promised not to "tell."

■ As to Dunlap's character, the evidence indicates that he showed no remorse or compassion for his victims either immediately after the offense or at any time thereafter. Instead, he bragged about the killings. Dunlap's mitigating evidence centered on the existence of three mitigating factors: his age, his cooperation with the police, and his abusive home environment.[52] With regard to the first two factors, Dunlap introduced evidence indicating that he was nineteen years old at the time he committed the murder and suggesting that out of concern for his girlfriend, his family, and the community, he offered to plead guilty in exchange for four life sentences. Dunlap also presented testi-

presence of DNA; and (2) that the trial court improperly permitted testimony from the defense investigator that Dunlap offered to plead guilty prior to trial in exchange for dismissal of the death penalty. Because we affirm the imposition of the death penalty in this case, any ruling on these issues would be essentially advisory. Hence, we decline to address the issues as presented in this case. *See People v. Wolff*, 111 Colo. 46, 48, 137 P.2d 693, 695 (1943) (concluding that where the People sought a conviction and an enhanced sentence and the defendant was so convicted and sentenced, the People were not entitled to review of alleged errors because they were not prejudiced by the errors).

In addition, the particular issues raised by the People are fact-specific to this case and there is no allegation that they are of general and broad import or that they are likely to arise in other contexts.

**52.** See § 16–11–103(4)(a), (h), (*l*).

mony indicating that his step-father physically abused him, even at his school and place of work. Moreover, Dunlap put on evidence that his mother, who suffered from bipolar disorder and was prone to experiencing disruptive "episodes" of mental illness, mentally abused him and refused to cooperate with the juvenile court system's early attempts to rehabilitate him. Finally, the testimony of one of Dunlap's witnesses suggested that Dunlap was aware that his step-father had sexually abused his sister.

Dunlap's criminal record prior to this incident consisted of three juvenile adjudications for aggravated robberies in 1989, three non-adjudicated aggravated robberies in 1993, an adult conviction for aggravated robbery and kidnapping in 1993, a non-adjudicated drive-by shooting in 1993, a non-adjudicated sale of crack cocaine in 1993, and a non-adjudicated escape attempt in 1994. Although this record is itself contemptible, Dunlap's offenses prior to the Chuck E Cheese's murders did not result in physical injury or death to another person.

More importantly, the nature of the killings, the number of victims, and Dunlap's lack of remorse or compassion are chilling indications of his character that effectively overcome Dunlap's mitigation evidence.

 We then move to consideration of the public interest in imposition of the death penalty in this case. It does not fall to us, as members of the judiciary, to evaluate the morality of the death penalty. Hence, the larger issues involved with the public interest do not belong in our analysis. What does belong in our analysis is whether the proceeding by which Dunlap was convicted and sentenced to death was fundamentally fair and whether his guilt was clearly established. The public interest demands that the person facing death be the perpetrator of the crime and that the trial and sentencing proceedings be fundamentally fair.

The evidence overwhelmingly supports Dunlap's guilt. This is neither a case in which there was a close issue concerning the identity of the murderer, nor a case where new evidence could someday reveal that the wrong person had been charged and convicted. Thus, we conclude that the public interest of assuring that the death penalty never be imposed upon an innocent person is assuaged.

We are also satisfied that the trial and sentencing were fundamentally fair. As we have noted, there were errors, but none of those errors rose to the level of calling into question the fair and deliberate nature of the process. The rights of the defendant were honored; the rights of the People and the victim's families were honored. The trial and sentencing proceeded in an orderly, appropriate manner, with due process concerns always at the forefront. The trial judge was impartial and unbiased, knowledgeable about the law and facts, and attentive to the case. Furthermore, we find no evidence in the record that the verdicts arose out of passion or prejudice on the part of the jury.

In the final analysis, it is the horror of the crime itself that looms large in our calculus of the propriety of the death sentence in this case. Dunlap killed four people and seriously wounded a fifth. He did it without provocation or cause, but rather with a brutal contempt for human life.

Both in our role as an appellate court reviewing trial court proceedings and in our role as independent arbiters to review the propriety of the sentence, we affirm the sentence of Nathan Dunlap to death. We dissolve the stay of execution and remand to the trial court to set a date for imposition of the death sentence.

Justice SCOTT does not participate.

